# CONSUMER'S CO-OP OF WALWORTH COUNTY, a Wisconsin Cooperative, Plaintiff-Respondent,

v.

## Christian E. OLSEN, a/k/a E. Christian Olsen, an individual, Defendant-Appellant,

## Jack OLSEN, a/k/a John Olsen, an individual, Defendant.

Supreme Court

*No. 86–1549. Argued November 3, 1987.—Decided February 10, 1988.*

(On certification from the court of appeals.)

(Also reported in 419 N.W.2d 211.)

466

For the defendant-appellant in the court of appeals there were briefs by *David J. Nommensen, Seymour, Kremer, Nommensen & Morrissy,* Elkhorn, and oral argument by *David J. Nommensen.*

For the plaintiff-respondent in the court of appeals there was a brief by *Paul G. Bonneson, Riemer*

■■■■■■■■■■■■

*Law Office,* Delavan, and oral argument by *Paul G. Bonneson.*

LOUIS J. CECI, J. This appeal is before this court on certification from the court of appeals pursuant to sec. (Rule) 809.61, Stats., and is from a judgment of the circuit court for Walworth county, Robert D. Read, Circuit Judge. The plaintiff-respondent, Consumer's Co-op of Walworth County, a Wisconsin cooperative (Consumer's Co-op), commenced this action against the defendant-appellant, Christian E. Olsen, a/k/a E. Christian Olsen (Chris Olsen), and defendant Jack Olsen, a/k/a John Olsen (Jack Olsen), seeking to impose liability on Chris and Jack Olsen for an unsatisfied judgment against a corporation, ECO of Elkhorn, Inc. (ECO), in which Chris Olsen owned a majority of the issued stock. The trial court entered judgment in favor of Consumer's Co-op for the sum of $38,851.42, having found the case at bar to be an "appropriate case to pierce the corporate veil . . . ." We disagree and, therefore, reverse.

ECO was incorporated by Chris Olsen on January 14, 1980. There were 2,200 shares of common stock authorized; 1,125 shares were issued to Chris Olsen for $3,589.00 on the day of the corporation's inception, and the remaining 1,075 shares authorized were issued to Jack and Nancy Olsen. The total initial capitalization was $7,018.25. When ECO commenced operations, Chris Olsen remained employed elsewhere on a full-time basis, with his work at ECO constituting only a part-time endeavor. ECO initially serviced only one customer and employed only one individual on a part-time basis for this purpose. In July of 1980, Chris Olsen commenced full-time employment with ECO.

The corporate officers were elected at one of the two formal board of directors meetings and consisted of Chris Olsen, Jack Olsen, and Nancy Olsen. The majority stockholder, Chris Olsen, was at all times relevant to this action the president and general manager of ECO. Jack Olsen, the father of Chris Olsen, was the treasurer and accountant, and Nancy Olsen, the mother of Chris Olsen, was the secretary. While Chris and Jack Olsen testified that the board of directors met and conferred about four or five times each week, there exists formal record only of the first meeting at which the corporate officers were elected and the meeting authorizing a reorganization under Chapter 11 of the United States Bankruptcy Code.

In 1977, Chris Olsen had opened a personal charge account with Consumer's Co-op. Shortly after the incorporation of ECO in January of 1980, this personal charge account was changed to a corporate charge account. Chris Olsen testified that no personal charges were made on the corporate account, and all billings were thereafter to ECO. Additionally, there was testimony that abundant measures were taken to assure that all corporate business was done in the corporation's name: the corporate name was either affixed to, or printed on, virtually all of the property and equipment associated with the day-to-day operation of the corporation.

By the end of 1981, ECO's difficulties were manifested by a negative shareholder equity of $2,723.02. The situation worsened: at the end of 1982, ECO had a negative shareholder equity of $62,815.60; at the end of 1983, a negative shareholder equity of $148,927.92; and, finally, a negative shareholder equity of $189,362.26 at the end of 1984. No dividends were paid at any time.

Throughout the relevant period of ECO's corporate existence, Consumer's Co-op had extended credit to ECO on an open account primarily for the purchase of bulk fuel. Commencing in June or July of 1983, ECO failed to remain current in the monthly payments on its account with Consumer's Co-op. However, Consumer's Co-op continued to extend credit to ECO until March 21, 1984, notwithstanding its policy to terminate credit after sixty days and the fact that after charges become more than thirty days old, the monthly statements of account explicitly stated that "additional credit cannot be extended until your account is brought current."

Finally, there was no evidence to indicate that corporate funds were used to pay personal expenses. There was, however, ample evidence that substantial personal assets were used to subsidize the operation of the corporation in the form of unprofitable leasing agreements and foregone salaries and rent.

## I.

As noted by the respondent, piercing the corporate veil is an equitable remedy. *Wiebke v. Richardson & Sons, Inc.*, 83 Wis. 2d 359, 364, 265 N.W.2d 571 (1978). Moreover, the respondent correctly asserts that a decision in equity will be reviewed for abuse of discretion. *Cf. Paterson v. Paterson*, 73 Wis. 2d 150, 154, 242 N.W.2d 907 (1976). *See also Production Credit Association v. Jacobson*, 131 Wis. 2d 550, 555, 388 N.W.2d 655 (Ct. App. 1986); *Mulder v. Mittelstadt*, 120 Wis. 2d 103, 115, 352 N.W.2d 223 (Ct. App. 1984). However, while it is true that an appellate court will not find an abuse of discretion if there is a reasonable

basis for the trial court's determination, it must be further recognized that the discretionary determination must be based upon "the appropriate and applicable law." *Hartung v. Hartung,* 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981). Thus, a discretionary determination based upon an erroneous view of law is not entitled to any deference.

The decision of the trial court articulated as significant to its decision to disregard the corporate existence of ECO, its factual finding of "control" of ECO by Chris Olsen and its finding that the corporation was "undercapitalized." The court expressly found no fraud to have been involved in the transaction at bar. The appellant contends on appeal that (1) control is not a factor significant in a determination of whether to pierce the corporate veil where the corporation under consideration is operated as a close corporation; (2) undercapitalization is not a factor relevant to a determination of whether to pierce the corporate veil where the action arises from a contract as opposed to tortious conduct; and (3) even if a relevant factor, undercapitalization does not constitute a sufficient basis to justify a decision to disregard the corporate entity.[1]

---

[1]The issues certified by the court of appeals were as follows:

"(1) Whether the Wisconsin Supreme Court's statement in *Wiebke v. Richardson & Sons, Inc.,* 83 Wis. 2d 359, 265 N.W.2d 571 (1978), to the effect that piercing the corporate veil is proper where 'the corporate form is used to evade an obligation, to gain an unjust advantage or to commit an injustice,' *id.* at 363, 265 N.W.2d at 573, requires that fraud be an essential element, proven and found as a fact, in order to resort to the remedy of piercing the corporate veil.

"(2) Whether and under what circumstances, if any, undercapitalization can serve as a basis to pierce the corporate veil."

Our analysis of the questions before us today commences with an examination of extant Wisconsin case law. In *Milwaukee Toy Co. v. Industrial Commission of Wisconsin,* 203 Wis. 493, 495, 234 N.W. 748 (1931), this court articulated the following fundamental premise implicated with respect to the imposition of personal liability on shareholders for corporate debts: "By legal fiction the corporation is a separate entity and is treated as such under all ordinary circumstances." That the "legal fiction" of a corporation is not one to be lightly disregarded remains the law in Wisconsin as well as in most other jurisdictions. Indeed, the significance of the doctrine of limited liability has been described by one commentator as follows:

> "According to firmly established legal principles, the corporation is recognized as a legal entity, separate and distinct from its shareholders. The obligations of the corporation are the responsibility of the corporate entity, not the shareholders, who are liable only for the amount they voluntarily put 'at risk' in the business venture. The insulation of shareholders is known as 'limited liability.' The purpose of limited liability is to promote commerce and industrial growth by encouraging shareholders to make capital contributions to corporations without subjecting all of their personal wealth to the risks of the business. This incentive to business investment has been called the most important legal development of the nineteenth century." Barber, *Piercing the Corporate Veil,* 17 Willamette L. Rev. 371, 371–72 (1981). (Footnotes omitted.)

Notwithstanding the unwavering adherence to the general principle of shareholder nonliability, there exist exceptions justifying, metaphorically, the "piercing of the corporate veil" or, stated otherwise, "disregarding the corporate fiction." The circumstances in which exceptions to the general rule of limited shareholder liability were described in *Milwaukee Toy* to be present where "applying the corporate fiction would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim . . . ." 203 Wis. at 496. However, the court in *Milwaukee Toy* cautioned with the well-heeded admonition: "the fiction of corporate entity is not to be lightly regarded." *Id.*

The principles announced in *Milwaukee Toy* were reaffirmed in *Sprecher v. Weston's Bar, Inc.,* 78 Wis. 2d 26, 253 N.W.2d 493 (1977), and later in *Wiebke,* 83 Wis. 2d at 363: "The general rule is that a corporation is treated as a legal entity distinct from its members . . . ." Nevertheless, in both *Sprecher* and *Wiebke,* the court found disregard of the corporate fiction to be warranted. The evidence found controlling in *Sprecher* consisted of the following: "that the individual defendants made no serious attempt to hold corporate meetings or to maintain records of corporate meetings and that [the corporation] had no substantial assets and that the individual defendants have taken out in salary basically all of the corporate profits." 78 Wis. 2d at 38–39. Likewise, in *Wiebke,* the circumstances supporting disregard of the corporation as an entity were undoubtedly present: the shareholder used the corporate checking account as his personal account and did not take wages but withdrew funds without making additions to the corporate account for sums

withdrawn. The court in *Wiebke* set forth the following factors as controlling in a determination of whether exception to the general principle of limited liability would be appropriate:

> "[T]he existence of the corporation as an entity apart from the natural persons comprising it will be disregarded, if corporate affairs are organized, controlled and conducted so that the corporation has no separate existence of its own and is the mere instrumentality of the shareholder and the corporate form is used to evade an obligation, to gain an unjust advantage or to commit an injustice." 83 Wis. 2d at 363.

Thus, absent evidence that equivocates the corporate disregard and consequential injustice present in *Wiebke* and *Sprecher,* the fundamental precept of limited liability must not give way wherever a close corporation fails to precisely observe corporate formalities.

Most recently, in *Ruppa v. American States Insurance Co.,* 91 Wis. 2d 628, 284 N.W.2d 318 (1979), this court again stated that limited shareholder liability must not be dispensed with lightly. Specifically, in response to appellant's argument in *Ruppa* that the corporate veil should be ignored because of the informal manner in which the business was conducted, this court noted but found unpersuasive the fact that the defendant saddle club had no regular meeting place and that its only asset was a bank account. 91 Wis. 2d at 645.

The court in *Ruppa* cited the United States Supreme Court decision in *Anderson v. Abbott,* 321 U.S. 349, *reh'g denied* 321 U.S. 804 (1944), for the following proposition:

"[L]imited liability for members of a corpora-
tion is the rule, not the exception. Exceptions to
that general rule were made, said the court, when
public policy demand[ed] it, when fraud was in-
volved, and when there was an obvious inadequacy
of capital, 'measured by the nature and magnitude
of the corporate undertaking.'" 91 Wis. 2d at
644–45 (citing *Anderson,* 321 U.S. at 362).

It was not necessary in *Ruppa* to determine whether
any of these factors would, standing alone, justify an
exception to the general rule of limited liability, for
the circumstances present in *Ruppa* were not found to
implicate any of the enunciated considerations. How-
ever, as applied in *Anderson,* it would appear that
fraud and an inadequacy of capital constituted rele-
vant, rather than independently controlling, princi-
ples.

 The concept of a minimally adequate level of
capitalization was expressly addressed in *Gelatt v.
DeDakis (In re Madeer's),* 77 Wis. 2d 578, 254 N.W.2d
171 (1977), in which undercapitalization was consid-
ered with respect to the subordination of a sharehold-
er's claim to that of other general creditors. While the
doctrines of subordination and piercing the corporate
veil are conceptually distinct, there are congruencies
between the theory justifying subordination of a loan
and piercing the corporate veil, to the extent that both
concepts arise from the notion that there exists a
minimal proprietary risk which should be borne by
shareholders. It has thus been observed that the
"doctrinal basis" of equitable subordination "is the
same, except as a matter of degree, as that underlying
the denial of limited liability . . . ." Hackney & Benson,
*Shareholder Liability for Inadequate Capital,* 43 U.

Pitt. L. Rev. 837, 880 (1982). In fact, in *Curtis v. Feurhelm,* 335 N.W.2d 575, 576 (S.D. 1983), the Supreme Court of South Dakota quoted the principles articulated in *In re Mader's* with respect to its analysis of undercapitalization as a factor relevant to piercing the corporate veil. Both equitable subordination and the equitable remedy of piercing the corporate veil operate to deny to shareholders the "separate entity privilege." *Cf.* H. Ballantine, Ballantine On Corporations, sec. 130 at 303 (rev. ed. 1946). Thus, while the equitable remedy of subordination of loans is less severe than is piercing the corporate veil, the principles articulated in *In re Mader's* are nevertheless applicable herein. Specifically, the purpose of "preventing the transfer to outside general creditors of risks properly born[e] by equity capital," 77 Wis. 2d at 608, is of equal force with respect to equitable subordination and piercing the corporate veil.

■

Contrary to *Ruppa,* which involved the allocation of risk between tort victim and shareholder, *In re Mader's* concerned the equitable balance of risk which must be maintained between shareholder and creditor. In this regard, the court noted that, "Subordination may also be required when it [is] established by expert testimony that the stated capitalization ... was inadequate to give the corporation a reasonable business chance to operate successfully in view of the nature and size of the business involved ...." More particularly, we held in *In re Mader's* that fraud or mismanagement was not a necessary predicate to subordination and that "[i]nequity enough to justify subordination exists when it is shown that a claim which is in reality a proprietary interest is seeking to compete on an equal basis with true creditors' claims."

*Id.* at 606. Likewise, in *Anderson,* 321 U.S. at 362, the United States Supreme Court stated: "The cases of fraud make up part of that exception [to shareholder limited liability]. ... But they do not exhaust it. An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability" (citations omitted).[2]

Our holding and rationale in support thereof in *In re Mader's* is consistent with the following commentary:

> "The attempt to do corporate business without providing any sufficient basis of financial responsibilities to creditors is an abuse of the separate entity and will be ineffectual to exempt the stockholders from corporate debts. It is coming to be recognized as the policy of the law that stockholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is ground for denying the separate entity privilege. It has been stated that a corporation's capitalization is a major consideration of courts in deciding whether a

---

[2]*See also Krivo Industrial Supply Co. v. National Distillers & Chemical Corp.,* 483 F.2d 1098, 1106–07 (5th Cir. 1973), *reh'g denied* 490 F.2d 916 (1974) (court emphasizes that only inequity and not fraud is "necessary predicate" to piercing corporate veil; "the theory of liability under the 'instrumentality' doctrine does not rest upon intent to defraud. It is an equitable doctrine that places the burden of the loss upon the party who should be responsible"); *White v. Jorgenson,* 322 N.W.2d 607, 608 (Minn. 1982); *Amfac Mechanical Supply Co. v. Federer,* 645 P.2d 73, 79 (Wyo. 1982).

legitimate separate corporate entity was maintained." 1 W. Fletcher, Cyclopedia Corporations, sec. 44.1 at 528 (rev. ed. 1983). (Footnotes omitted.) *See also* H. Ballantine, *supra* p. 9, sec. 129 at 302–03; sec. 137 at 314–315.

As such, we reject appellant's argument that undercapitalization is insignificant with respect to contract actions absent additional proof of fraud or constructive fraud.

In this regard, we acknowledge appellant's argument that because of the volitional nature of a contractual relationship and the opportunity to investigate the capital structure or obtain a personal guarantee prior to extending credit, inadequate capitalization is not relevant to a determination of whether to disregard the separate legal entity of a corporation. A similar argument was rejected in *Labadie Coal Co. v. Black,* 672 F.2d 92, 100 (D.C. Cir. 1982), upon the following well-stated grounds:

> "We recognize the position of some commentators that undercapitalization should not play an important part in contract cases, principally because a person dealing with a corporation in a contract setting is expected to have had the opportunity to investigate the corporation with which it deals, and essentially to have assumed the risk that the corporation may prove unable to meet its financial obligations. This position has not been adopted by most of the courts who have considered the problem, however. Furthermore, as another commentator has noted, 'If the prior opportunity to investigate is a consideration, then the plaintiffs' lack of sophistication is equally tenable against the presumption that they knowingly

480

assumed the risk of the corporation's undercapitalization.' [Barber, *Piercing the Corporate Veil,* 17 Willamette L. Rev. 371, 386 (1981).]

"This [undercapitalization] is only a single example of how the 'unfairness' prong of the piercing test may be satisfied .... The 'errant' party need not have willfully wronged the other party, nor need he have engaged in anything amounting to fraud in their relationship. The essence of the fairness test is simply that an individual businessman cannot hide from the normal consequences of *carefree* entrepreneuring by doing so through a corporate shell." (Emphasis in original.) (Footnotes omitted.)

We agree that inadequate capitalization may be a factor relevant to whether an injustice is present sufficient to justify piercing the corporate veil in a contract case. The volitional nature of a contractual relationship presents a cognizable distinction between contract and tort cases; however, this distinction is more appropriately recognized as one which may justify the application of the doctrines of estoppel and waiver than as to preclude the invocation of the equitable remedy of piercing the corporate veil in a contract case.[3] Stated otherwise, whether a contrac-

[3]That inequities may exist justifying the imposition of personal liability on shareholders notwithstanding the volitional nature of a contractual relationship was also addressed in the following commentary:

"This hesitancy to pierce in the contract context is defensible for sound policy reasons. Absent very compelling equitable considerations, courts should not rewrite contracts or disturb the allocation of risk the parties have themselves established. But the mere fact that the relationship is contractual should not end the inquiry. The full context of the relationship must be examined. There are two very important considerations: first, what sort of

tual relationship is truly one in which a creditor had the opportunity to investigate the capital structure of a debtor and knowingly failed to exercise the right to investigate before extending credit, such that the creditor should be precluded from piercing the corporate veil, should be decided with respect to the particular facts of each case rather than by the denial to all contract creditors of resort to this equitable remedy by a presumption of an "assumption of risk."

■

While significant, undercapitalization is not an independently sufficient ground to pierce the corporate veil. In order for the corporate veil to be pierced, in addition to undercapitalization, additional evidence

---

contract is involved and, second, is the nature of the activity complained of something of which the plaintiff can be considered to have assumed the risk?

\*\*\*

"Small creditors such as trade creditors, consumers, and employees are not normally in a position to do a full investigation or to negotiate guarantees. Rather, they tend to rely on the business's appearance of substance, and, in the case of trade creditors, to some extent credit reporting. Measures available to them would not necessarily reveal the relationship of the shareholders to the corporation and the corporation's lack of economic substance.

\*\*\*

"When the plaintiff can only show a closely-held corporation where formalities have not been maintained, his loss is likely to have resulted from the risks of business rather than from the defendant's conduct." Clark, *Piercing the Corporate Veil in Florida: The Requirement of "Improper" Conduct,* 16 Stetson L. Rev. 59, 95–97 (1986) (Footnotes omitted.) *See also* H. Henn & J. Alexander, Laws of Corporations, sec. 146 at 348–49 (3d ed. 1983); Barber, *supra* p. 474, at 386 ( discusssion of creditor sophistication with respect to allocation of risk in contract cases).

of failure to follow corporate formalities or other evidence of pervasive control must be shown.[4]

Consequently, we hold today, as we have previously, that both inadequate capitalization and disregard of corporate formalities are significant to a determination of whether the corporation has a separate existence such that shareholders can claim the accoutrement of incorporation: nonliability for corporate debts. That neither factor will independently justify piercing the corporate veil may perhaps be most

[4]Other jurisdictions have similarly analyzed inadequate capitalization as a factor relevant but not sufficient to pierce the corporate veil. *See, e.g., West v. Costen,* 558 F. Supp. 564, 585 (W.D. Va. 1983) ("Of course, the conclusion to disregard the corporate entity must involve a number of these factors; no single factor is sufficient. 'But undercapitalization, coupled with disregard of corporate formalities, lack of participation on the part of the other stockholders and the failure to pay dividends while paying substantial sums, whether by way of salary or otherwise, to the dominant stockholder, all fitting into a picture of basic unfairness, has been regarded fairly uniformly to constitute a basis for imposition of individual liability under the doctrine.'") (quoting *De Witt Truck Brokers v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 687 (4th Cir. 1976)). *Compare Minton v. Cavaney,* 56 Cal. 2d 576, 364 P.2d 473, 15 Cal. Rptr. 641 (1961) *with Harris v. Curtis,* 8 Cal. App. 3d 837, 843, 87 Cal. Rptr. 614, 619 (1970) ("undercapitalization is a 'factor' to be considered, *along with all other factors present in the case,* in determining whether individuals identified with an undercapitalized corporation as shareholders, directors, or officers, should be declared the *alter ego* of the corporation and held personally responsible for the corporate obligations") (emphasis in original); *Tigrett v. Pointer,* 580 S.W.2d 375, 382 (Tex. Ct. App. 1978) (undercapitalization important but not sufficient ground to pierce the corporate veil); *Harlow v. Fibron Corp.,* 100 N.M. 379, 383, 671 P.2d 40, 44 (Ct. App. 1983) (undercapitalization one factor relevant to determination of whether there was an "improper purpose" such that alter ego doctrine may be invoked).

visibly demonstrated by a delineation of those elements comprising that which is ordinarily deemed the "alter ego" theory or "instrumentality" rule. This court in *Wiebke* referred to, but did not enumerate, the factors to be considered with respect to the instrumentality doctrine. "In applying the 'instrumentality' or 'alter ego' doctrine, the courts are concerned with reality and not form, with how the corporation operated and the individual defendant's relationship to that operation." Fletcher, *supra* p. 480, sec. 43.10 at 490. The "instrumentality" or "alter ego" doctrine requires proof of the following elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. *Id.* (footnote omitted).[5]

---

[5]A test which is essentially identical has been articulated as a two-prong test requiring: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual [shareholders] no longer exist; and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." Barber, *supra* p. 474, at 376 (footnote omitted). This test, as does the instrumentality test articulated herein, entails essentially a "formalities requirement" and a "fairness requirement." *Id.*

Application of the above framework indicates that failure to follow corporate formalities is a factor relevant to the first element, whereas inadequate capitalization is primarily significant with respect to whether control has been exercised in such a manner as to result in injustice.[6] Stated otherwise, it is apparent that just as control, absent a showing of injustice, would not justify exception to the general rule of corporate nonliability,[7] injustice, absent the establishment of control, would not constitute adequate grounds to pierce the corporate veil.[8] Hence, "The absence of any one of these elements prevents 'piercing the corporate veil.'" Fletcher, *supra* p. 480 sec. 43.10 at 490. (Footnote omitted.) However, in determining those factors which will satisfy the elements fundamental to piercing the corporate veil, we agree that because of the equitable nature of this remedy, flexibility must be maintained:

> "It is not the presence or absence of any particular factor that is determinative. Rather, it is a combination of factors which, when taken together with an element of injustice or abuse of

[6]*See, e.g., Labadie Coal Co. v. Black,* 672 F.2d 92, 96–99 (D.C. Cir. 1982); Barber, *supra* p. 485, at 402–03 ("adequacy of the corporation's capitalization looms large in the court's evaluation of the unfairness prong"), *id.,* at 386; Note, *Piercing the Corporate Veil: The Alter Ego Doctrine Under Federal Common Law,* 95 Harv. L. Rev. 853, 854–55 (1982).

[7]*See, e.g., Krivo Industrial Supply Co. v. National Distillers and Chemical Corp.,* 483 F.2d 1098, 1106 (5th Cir. 1973); *Jablonsky v. Klemm,* 377 N.W.2d 560, 564 (N.D. 1985).

[8]*See, e.g., Fisser v. International Bank,* 282 F.2d 231, 240 (2d Cir. 1960) ("we are pointed to no authorities which justify a disregard of a corporation's separate existence merely because of its undercapitalization when its controlling shareholder has at least regarded the formalities of such existence").

corporate privilege, suggest that the corporate entity attacked had 'no separate mind, will or existence of its own' and was therefore the 'mere instrumentality or tool' of the [shareholder]." *Glenn v. Wagner,* 313 N.C. 450, 458, 329 S.E.2d 326, 332 (1985).

## II.

While holding in both tort and contract cases that inadequate capitalization is a factor significant to piercing the corporate veil, we reject the respondent's contention that there is a continuing requirement to maintain an adequate level of capitalization. Such an approach was implicitly rejected by this court in *In re Mader's,* in which the court indicated that "the shareholders have assumed an appropriate proprietary risk ... [w]here a corporation is once provided with a reasonably adequate fund of stated capital ...." 77 Wis. 2d at 608–09. Thus, we agree that "[t]he adequacy of capital is to be measured as of the time of formation of the corporation. A corporation that was adequately capitalized when formed but which subsequently suffers financial reverses is not undercapitalized." Fletcher, *supra* p. 480, sec. 44.1 at 529 ( footnotes omitted). *See also* H. Henn & J. Alexander, *supra* p. 482 n. 3, sec. 146 at 349; Hamilton, *The Corporate Entity,* 49 Tex. L. Rev. 979, 986 (1971); *Gardner v. First Escrow Corp.,* 72 Or. App. 715, 723, 696 P.2d 1172, 1178, *rev. denied* 299 Or. 314, 702 P.2d 1111 (1985). However, the court in *In re Mader's* did further comment that the initial stated capital, while adequate at the time of the inception of the corporation, might not have been sufficient when a second store was opened. 77 Wis. 2d at 610. Consequently, the court

found significant the fact that the initial capital was increased prior to the opening of the second store. Hence, while a court's examination of the adequacy of capitalization may inquire beyond the capitalization at the inception of the corporation, such inquiry may be made only in those circumstances where, as in *In re Mader's,* the corporation distinctly changes the nature or magnitude of its business. Likewise, it has been observed:

> It is clear, therefore, that adequacy of capital must be measured at the beginning period of corporate existence. As a condition to the receipt of a shield of limited liability, the law requires that shareholders adequately capitalize the corporation. Once shareholders have done so, there is no requirement that they provide for losses beyond the amount of their original subscription in the corporation. The case law recognizes that a corporation formed with adequate capital will not subsequently be rendered under-capitalized, so as to impose shareholder liability or require subordination of shareholder loans, merely because the business suffers losses.
>
> ***
>
> Conversely, where a corporation commences business with capital then adequate, and later substantially expands the size or nature of the business with an attendant substantial increase in business hazards, the corporation might be deemed inadequately capitalized unless there is an infusion of additional risk capital by shareholders.

Hackney & Benson, *supra* p. 487, at 898–99 (citing *In re Mader's,* 77 Wis. 2d 578). Finally, with regard to that amount of capital which constitutes sufficient capitalization, we restate the following standard which

487

emphasizes economic viability rather than an inflexible computation of minimal capitalization: a corporation is undercapitalized when there is an "obvious inadequacy of capital, 'measured by the nature and magnitude of the corporate undertaking.'" *Ruppa,* 91 Wis. 2d at 645 (quoting *Anderson,* 321 U.S. at 362).[9]

## III.

With respect to the facts at issue herein, the respondent has failed to convince us that corporate formalities were so egregiously ignored, or that control so pervasively exercised, such as to constitute a situation where recognition of "the corporate fiction would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim ...." *Milwaukee Toy,* 203 Wis. at 496. In the case at bar, stock was issued, officers were elected, meetings of the board of directors were frequently held, and all business was undertaken in the corporate name. Moreover, there was no indication of improper commingling of personal and corporate assets. Those financial transactions between Chris Olsen and the corporation were approved, though informally, by the board of directors and were undertaken for the purpose of infusing, rather than improperly withdrawing, capital. We do not find the fact that the

---

[9] *See also* Hackney & Benson, *supra* p. 477, at 897–98 ("What is needed is financial backing sufficient to provide a reasonable business chance, not a likelihood of success"); Hamilton, *supra* p. 486, at 986; *Minton v. Cavaney,* 56 Cal. 2d 576, 580, 364 P.2d 473, 475, 15 Cal. Rptr. 641, 643(1961)(capitalization inadequate where it is "trifling compared with the business to be done and the risks of loss ...." ).

meetings of the board of directors were informal to be of particular significance. This is particularly true in light of the passage of our close corporation law, sec. 180.995, Stats.

The Wisconsin close corporation law provides generally for greater flexibility with respect to corporate form and expressly provides: "The failure of a statutory close corporation to observe usual corporate formalities or requirements relating to the exercise of its corporate powers or the management of its business and affairs is not grounds for imposing personal liability on the shareholders for obligations of the corporation." Sec. 180.995(20), Stats. The close corporation law was designed to accommodate the "special needs" of closely held corporations. The comments accompanying sec. 180.995 explained:

> "The need to establish separate statutory provisions to govern the operations of closely held corporations, which tend to be small and run by only a few shareholders (often family members), has been recognized for some time. As a result, at least 16 states (beginning with New York in 1948) have adopted various laws designed specifically for close corporations. These close corporation statutes are generally intended to give the shareholders of a closely held corporation flexibility to vary the normal corporate rules to meet their particular business and personal needs. In large measure, they are based on the assumption that without special recognition the courts would require small businesses to strictly conform to the statutory norms and requirements that apply to the large corporate model." 1983 Wisconsin Act 340 (prefatory note).

It would appear from the above-quoted committee note that the purpose of the legislature in adopting sec. 180.995 was precisely to avoid the strict application advocated by the respondent herein.

The ECO date of incorporation and all the action at issue herein occurred prior to May 1, 1984, the effective date of sec. 180.995. As such, ECO could not have amended its articles of incorporation such as to avail itself of the protection of sec. 180.995. However, while the fact that ECO was not a statutory close corporation would preclude application of the provisions of sec. 180.995 to ECO, we nevertheless find, in light of the articulated purpose of the close corporation law, that a failure of shareholders in a closely held corporation to strictly observe corporate formalities is not relevant to our decision of whether to pierce the corporate veil of a close corporation absent evidence indicative of and amounting to a true disregard of the corporate entity.[10] It has likewise been observed

---

[10]Those factors which this court has previously addressed which are relevant to whether there has been a disregard of the corporate entity include: failure to hold corporate board meetings; failure to maintain records; inadequate capitalization at the inception of the corporation; and intermingling of personal and corporate funds. *See, e.g., Wiebke,* 83 Wis. 2d at 364; *Sprecher,* 78 Wis. 2d at 38–39. More generally, factors relevant to the first prong of the instrumentality analysis of whether "shareholders have confused the corporation's identity with their own" may include: "1) The shareholder's treating the corporate assets as his own; 2) Withdrawal of capital from the corporation at will; 3) The shareholder's holding himself out as being personally liable for the debts of the corporation; 4) Failure to issue stock; 5) Co-mingling of assets; and 6) Managing the corporation without regard to its independent existence." Clark, *supra* p. 482 n. 3, at 68. *See also Barber, supra* p. 474, at 402–03.

with respect to the absence of formal board of directors' meetings. "[M]ere failure upon occasion to follow all the forms prescribed by law for the conduct of corporate activities will not justify [disregard of the corporate entity]." *Curtis,* 335 N.W.2d at 576–77 (citations omitted). Moreover, while there is an apparent failure in facts sufficient to establish "control" of such a degree that the corporation had "no separate mind" under the first prong of the instrumentality analysis, because we further find that there has been no consequential injustice, we need not rest our decision upon this finding.

As we have explained above, a gross inadequacy in capitalization may constitute an "injustice" such as to justify the piercing of a corporate veil under an instrumentality analysis, where, in addition, "control" and "causation" are established. While the trial court stated in its findings of fact that the corporation was "undercapitalized," there is no indication of whether this finding was based upon the court's finding with respect to initial capitalization or its capitalization at some later point. We find that the initial capitalization of over $7,000.00 was not, and could not be reasonably viewed as, an obvious inadequacy of capital as measured by the slight size of the initial undertaking. Furthermore, we need not reach the question of whether the increase in the size of ECO's undertaking was of such a nature and magnitude that additional capital would be required. To the extent that it could be argued that the business expansion required additional capital, the right to

assert this position was waived in the most unmistakable manner.[11]

This court has defined waiver as a "'voluntary and intentional relinquishment of a known right.'" *Gonzalez v. City of Franklin,* 137 Wis. 2d 109, 128, 403 N.W.2d 747 (1987) (quoting *Employers Ins. of Wausau v. Sheedy,* 42 Wis. 2d 161, 166, 166 N.W.2d 220 (1969)); *Bank of Sun Prairie v. Opstein,* 86 Wis. 2d 669, 273 N.W.2d 279 (1979). Evidence sufficient to establish waiver must establish that "the person against whom the waiver is asserted had at the time knowledge, actual or constructive, of the existence of his rights or facts upon which they depended." *Mulvaney v. Tri State Truck & Auto Body, Inc.,* 70 Wis. 2d 760, 768, 235 N.W.2d 460 (1975). Moreover, we have stated that "intent to waive may be inferred as a matter of law from the conduct of the parties ...." *Gonzalez,* 137 Wis. 2d at 129.

The related but distinct doctrine of equitable estoppel requires as the basis for its invocation:

---

[11]We note that the parties in their briefs did not, as we do here, precisely frame the issue as one of waiver or estoppel; rather, the parties addressed this issue more generally as whether creditors may be presumed to have "assumed the risk" of undercapitalization. However, as we have stated previously, "This court's duty is not limited by the reasons assigned for reversing or sustaining a decision complained of. It extends as far as the justice of the case, as shown by the record, requires. To see that justice prevails is the overshadowing controlling function of the court." *Andrzejewski v. Northwestern Fuel Co.,* 158 Wis. 170, 181–82, 148 N.W. 37 (1914). Thus, because the facts set forth by the parties under the related theory of "assumption of risk" are operative with respect to waiver and estoppel and compellingly indicate that failure to address these issues would result in injustice, we address the issues herein.

'... action or nonaction on the part of the one against whom the estoppel is asserted which induces reliance thereon by another, either in the form of action or nonaction, to his detriment ....' Three facts must be present: (1) *Action or nonaction* which induces (2) *reliance* by another (3) to his *detriment*. ... *Bank of Sun Prairie,* 86 Wis. 2d at 680 (emphasis in original) (quoting *In Matter of Estate of Alexander,* 75 Wis. 2d 168, 183, 248 N.W.2d 475 (1977)). *See also Gabriel v. Gabriel,* 57 Wis. 2d 424, 429, 204 N.W.2d 494 (1973). Moreover, the reliance established in support of equitable estoppel must be reasonable. *Bank of Sun Prairie,* 86 Wis. 2d at 680–81; *Chicago & North Western Trans. Co. v. Thoreson Food Products, Inc.,* 71 Wis. 2d 143, 154, 238 N.W.2d 69 (1976).

While not binding upon this court, we note that the issue of waiver and estoppel in the context of precluding the operation of the equitable remedy of piercing the corporate veil was recently addressed by the federal district court for the western district of Wisconsin in *Bostwick-Braun Co. v. Szews,* 645 F. Supp. 221 (W.D. Wis. 1986). At issue in *Bostwick-Braun* was a creditor's attempt to pierce the corporate veil for a contract claim on the basis of undercapitalization. While the court opined that undercapitalization would be relevant under Wisconsin law to a determination of the propriety of piercing the corporate veil in a contract claim, the court nevertheless refused to impose this equitable remedy on the basis of its finding that the right to assert undercapitalization as a basis to pierce the corporate veil had been waived or, alternatively, that the creditor was estopped from asserting such a claim. Specifically, the court found:

"Estoppel would appear to be established here by virtue of plaintiff's unexercised right to ascertain the capital structure of the BENNS Corporation coupled with the defendants' continued purchases of merchandise from plaintiff in the corporation's name. Defendants had the right to rely on plaintiff's failure to exercise its right. Even stronger is the waiver argument. Absent allegations of fraud, it is impossible to square plaintiff's conduct during the six years it did business with the corporation with anything but an intentional relinquishment of its right to challenge the corporation's adequacy of capital. Plaintiff continued to advance the corporation credit while it had the right (which it once exercised) to demand a financial statement to determine the capital structure." 645 F. Supp. at 227.

In the present case, the circumstances indicative of waiver are substantially stronger. Specifically, there was evidence indicating that commencing in June or July of 1983, ECO failed to remain current in its monthly payments on its open account. Nevertheless, Consumer's Co-op continued to extend credit. By December 31, 1983, the statement of account indicated that $20,386.14 was owed to the Consumer's Co-op, and $10,780.06 was past due. The statement expressly indicated: "additional credit cannot be extended until your account is brought current." Despite the obvious depreciation of ECO's financial status and the indication on the statement that additional credit would not be extended, credit was continued through March 21, 1984. In sum, Consumer's Co-op continued to permit ECO to become further indebted from the $20,386.14 due on the account as of December 31, 1983, to $40,661.44 owed for credit extended through March 21, 1984. Credit remained available notwithstanding

the fact that the account and the statements were in the name of ECO. No personal guarantee was requested initially, or as a condition to the continued receipt of credit.

As the above-stated facts indicate, Consumer's Co-op not only had an opportunity to investigate the capital foundation of ECO, but knew, given the delinquency in the payments on ECO's account, that ECO's business was failing. By continuing to extend credit and increase ECO's indebtedness, notwithstanding and in contravention of its own policy to terminate credit after sixty days, Consumer's Co-op waived the right to claim inadequacy of capitalization as a basis to pierce the corporate veil. Likewise, a similarly strong basis would exist to deny Consumer's Co-op's claim on the ground of estoppel: Consumer's Co-op failed to terminate credit despite the unequivocal indication of the financial difficulties of ECO and, thus, caused ECO to substantially increase its indebtedness in reasonable reliance upon Consumer Co-op's relinquishment of its right to examine its capital structure before continuing to extend credit or to demand a personal guarantee as a condition to the continued availability of credit.

In a related context, this court in *Pleasure Time, Inc. v. Kuss,* 78 Wis. 2d 373, 254 N.W.2d 463 (1977), found the defense of estoppel to be applicable in a foreclosure action. The vendors in *Pleasure Time* asserted the bankruptcy of a guarantor as the basis for a foreclosure. Reliance upon the bankruptcy as the justification for the foreclosure was rejected since, notwithstanding the fact that the bankruptcy would have constituted a default under the land contract, the vendors had continued to demand payments from

the purchaser, without claiming a default, for almost two years prior to the foreclosure, during which time the vendors had knowledge of the bankruptcy. *Id.,* at 382, 383–84 n. 5. Similarly, in the case at bar it would be unjust to impose personal liability upon appellant for debt incurred in the corporate name. Chris Olsen relied, to his detriment, upon Consumer's Co-op's extension of credit, which credit was continued without any request for a personal guarantee or indication that Consumer's Co-op would seek to hold appellant personally liable for the debt incurred.

For these reasons, we find that application of the exception to the general rule of limited shareholder liability is, as such, not necessary to prevent an inequitable result and would, in fact, create an inequity. At its inception, ECO commenced operations as a separate legal entity. There is inadequate evidence indicating such a degree of "control" as to constitute the absence of a separate corporate existence under the first prong of the instrumentality test. Although the board of directors failed to regularly record minutes of meetings, they met frequently, thus fulfilling, in substance, the purpose attendant with this requirement. Likewise, great measures were taken to promote and distinguish the corporate name, and all business was undertaken in the name of ECO. Further, contrary to there being any indication of an improper draining or siphoning of corporate funds, there was substantial evidence of the shareholders' commitment of their personal assets to the corporation.

Additionally, in view of the fact that ECO commenced business as a part-time operation, the initial stated capital was not "obviously insufficient." Thus,

to the extent that "control" may have been exercised under the first prong of an instrumentality analysis, because no "injustice" was created by an inadequacy of initial capitalization, the corporate veil must not be pierced.

Finally, we need not reach the issue of whether the change in the size and nature of the corporation was of such significance as to require an increase in capitalization; Consumer's Co-op is precluded from asserting any claim as to subsequent undercapitalization as a factor constituting an "injustice" justifying disregard of the separate legal entity of the corporation on both the grounds of waiver and estoppel. Accordingly, we find that there are inadequate grounds to find that the corporation was "initially" undercapitalized and further find that Consumer's Co-op waived the right to claim, or is alternatively estopped from claiming, that the corporate veil should be pierced on the basis of "subsequent" undercapitalization. Consequently, because neither "control" evincing the absence of a separate corporate existence nor "injustice" has been shown, the case at bar is not one in which exception should be made to the general rule of limited shareholder liability.

*By the Court.*—The decision of the circuit court is reversed, and the cause is remanded with directions to vacate the judgment heretofore entered in favor of respondent and to enter judgment in favor of appellant.