Patricia CAPSAVAGE and John Capsavage, Plaintiffs-
Respondents,†

v.

Raymond J. ESSER, d/b/a Sundance Marine and/or San
Diego Sea Ray, Defendant-Appellant.

Court of Appeals

*No. 97–2886. Submitted on briefs November 30,
1998.—Decided January 13, 1999.*

(Also reported in 591 N.W.2d 888.)

†Petition to review denied.

404

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Janice A. Rhodes* of *Kravit & Gass, S.C.* of Milwaukee.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *William R. Steinmetz* and

*Kanmani H. Kriozere* of *Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C.* of Milwaukee.

Before Brown, Nettesheim and Anderson, JJ.

ANDERSON, J. Raymond J. Esser appeals from a judgment holding him personally liable for the breach of a contract between Sundance Marine (d/b/a San Diego Sea Ray) and Patricia and John Capsavage. The Capsavages sued Esser, a fifty-percent shareholder in Sundance Marine, when that company failed to deliver the yacht the Capsavages purchased. The trial court concluded that San Diego Sea Ray was an unincorporated agent and had failed to disclose its corporate principal (Sundance Marine) to the Capsavages, and, on this basis, attributed personal liability to Esser, a corporate shareholder of Sundance Marine. On appeal, Esser asserts that he is entitled to protection from liability as a shareholder of Sundance Marine. He argues that personal liability only attaches to him if he is directly involved or actually participates in the transaction or contract. We agree; therefore, the judgment against Esser for breach of contract is reversed.

## FACTS

In June 1990, Esser invested in Sundance Marine, a boat dealership incorporated in California. Esser received an equal amount of corporation shares as his business partner and the only other shareholder, Roy L. Gaertig. The Sundance Marine articles of incorporation were then amended listing Gaertig as the corporation's president and Esser as its chief financial officer and secretary. Also in June 1990, Sundance

407

Marine opted to do business under the name San Diego Sea Ray (hereinafter SDSR).

On October 12, 1991, the Capsavages contracted with SDSR to purchase a sport yacht. At that time, the Capsavages tendered a check to SDSR for $60,000 as a down payment. Shortly thereafter, the Capsavages paid the remaining balance of $231,987.50. During this transaction, the Capsavages dealt exclusively with an SDSR salesperson.

In the purchase agreement, SDSR reserved the right to display the yacht at an upcoming boat show. At the boat show, someone wanted to buy the Capsavages' yacht. SDSR, again communicating through a salesperson, proposed to the Capsavages that if they allowed the interested individual to purchase their yacht, then the amount they paid for it could be applied as a down payment for a larger yacht. The Capsavages agreed and signed the purchase agreement for the larger yacht for $421,596.63 on February 28, 1991. The boat dealership signed both purchase agreements as "San Diego Sea Ray."

Meanwhile, SDSR's operations were not running smoothly. The boat dealership had serious money problems. As a result of "not sufficient funds" checks it had issued, SDSR was "out of trust" with its financing companies and overdrawn on its bank account. At trial, Esser testified that he was not involved in the day-to-day operations of the company and that Gaertig made 99.9% of the business decisions. The details of SDSR's dire financial situation became clear after an audit was conducted by the yacht manufacturer's credit department. Apparently, the dealership had sold boats and had not forwarded the payments for those boats to the manufacturer; instead, SDSR used the funds to cover its operating expenses. In spite of Gaertig's apparent

financial mismanagement of SDSR, Esser infused capital and made personal guarantees with creditors to keep SDSR's doors open.

The Capsavages never received a boat from SDSR. SDSR stopped doing business in March 1992. By this time, the Capsavages had paid $291,987.50 to SDSR for a boat that they had never received. SDSR had resold the first yacht the Capsavages purchased, but never ordered the larger model or forwarded the payment to the yacht manufacturer.

The Capsavages filed suit against Esser for, among other things, breach of contract. The Capsavages contended that SDSR was not a corporation and did not present itself as one in its business dealings. Therefore, SDSR was a joint venture or partnership, and as its agent, Esser was personally liable for its debt.

In his defense, Esser argued that he should not be held liable as an agent who failed to disclose the principal because he "had absolutely no involvement in the transaction." Furthermore, he contended that SDSR was the trade or "d/b/a" name for Sundance Marine, a California corporation. Thus, Esser argued that he is shielded from liability as a corporate shareholder.

After a trial to the court, Esser was found personally liable for the contract breach. In an oral decision, the court stated, "You can't avoid liability if the entity is being operated behind the scenes in the manner that we have here improperly." To support its conclusion that the "Capsavages were never sufficiently . . . apprised of the [corporate] status," the court found the following facts: the salesperson did not mention this fact to them; the corporate status was not sufficiently indicated on SDSR stationery, the dealership's building or when it signed things; no regular bookkeeping

occurred; and there was an absence of tax returns, books and ledgers. The court held that a situation "fraught with problems" weighed "against the limited liability that [Esser] is asserting as a defense."

> Mr. Esser [was] too close to the fire, too close to the operation, too close to the things that Mr. Gaertig was doing wrong; and as far as dealing with the public . . . the analysis is that there's a duty to disclose the—properly the corporate status . . . .
>
> [T]he improper operations here in the court's mind make the case for finding that Mr. Esser . . . is liable for the Capsavage transaction. . . .

Judgment was entered in favor of the Capsavages and damages were assessed against Esser in the amount of $384,553.73. Esser appeals.

### DISCUSSION

The crux of Esser's appeal is that as a corporate shareholder he should be shielded from personal liability for a contract made by the corporation. Indeed, it is a long-standing rule in Wisconsin that a corporation's shareholders are not individually liable for contracts made by the corporation's officers or agents. *See Sprecher v. Weston's Bar, Inc.*, 78 Wis. 2d 26, 37, 253 N.W.2d 493, 498 (1977). Thus, corporate shareholders enjoy limited liability. "The purpose of limited liability is to promote commerce and industrial growth by encouraging shareholders to make capital contributions to corporations without subjecting all of their personal wealth to the risks of the business." *Consumer's Co-op v. Olsen*, 142 Wis. 2d 465, 474, 419 N.W.2d 211, 213–14 (1988) (quoted source omitted). However, this rule is not absolute. An exception will be

made to metaphorically "pierce the corporate veil" and thus disregard the corporate entity and attach liability to shareholders in the following instance: where the corporation's "affairs are organized, controlled and conducted so that the corporation has no separate existence of its own and is the mere instrumentality of the shareholders and the corporate form is used to evade an obligation, to gain an unjust advantage or to commit an injustice." *Id.* at 476, 419 N.W.2d at 214 (quoted source omitted).

In response, the Capsavages argue that common law principles of agency also apply here. *See generally Benjamin Plumbing, Inc. v. Barnes*, 162 Wis. 2d 837, 848–56, 470 N.W.2d 888, 893–96 (1991) (*Benjamin Plumbing II*). Under agency principles, when making a contract, the contracting party must be informed if the principal is a corporation. *See id.* at 851, 470 N.W.2d at 894. In general, a contracting party's expectation is that the agent will be personally liable on the contract. *See id.* at 850, 470 N.W.2d at 894.

> It is the agent who seeks to escape liability who has the burden of proving that the principal's corporate status was disclosed. Such a duty of disclosure creates no hardship on agents, for it is within their power to relieve themselves of liability. Conversely, the contracting party does not have any duty to inquire into the corporate status of the principal even when it is within that party's capability of doing so. As a matter of fairness, the contracting party should not be saddled with the burden of "ferret[ing] out the record ownership" of the principal's business.

*Id.* at 851, 470 N.W.2d at 894 (citations omitted).

Furthermore, the rules of agency proclaim that where the principal is only partially disclosed, the agent can be held liable on the contract. *See id.* at 848, 470 N.W.2d at 893. From this rule has developed a corollary rule: if an agent only partially discloses the principal's corporate status to the contracting party, the agent is liable. *See id.* This is termed the "undisclosed principal" theory of liability.

In reply, Esser asserts that "[a] corporate shareholder cannot be held personally liable for a corporate debt because he made financial contributions to the corporation while another shareholder mismanaged the corporation's business." He claims that the court "took a flying leap from its finding that a buyer had no notice of a seller's corporate status and somehow landed on the conclusion that a shareholder who made capital contributions must be personally liable for the corporation's debts." He argues that the court treated an agent's failure to disclose the corporate principal as equivalent to a disregard of corporate formalities.[1]

---

[1] The Capsavages did not plead a piercing the corporate veil claim. In fact, they repeatedly denied this as the theory of their case. At a June 27, 1994 hearing before trial, Esser's counsel requested a clarification that this theory was not at issue. The court responded, "That's the way [Capsavage's counsel] argued his case." Again at a February 6, 1995 motion hearing, Esser's counsel expressed concern that the piercing the corporate veil theory was being intermingled with the undisclosed principal theory in Capsavage's counsel's arguments:

> MR. BAUMAN: Your Honor, . . . the problem legally . . . is that there's no legal basis for the argument that's just been espoused. Now, there are two separate claims that I think we're intermingling; and they are separate and there's different elements to each. One is piercing the corporate veil; and in order to pierce the corporate veil you have to show that the corporate formalities were not

Consequently, Esser contends that the trial court applied an incorrect theory of law—disregard of corporate formalities, which pierces the corporate veil—to find Esser's personal liability.

We will now examine whether Esser should be held personally liable for SDSR's contract breach when SDSR's agent failed to disclose its corporate status. "Because the relevant facts are undisputed, this is a question of law and one this court reviews de novo." *GMAC Mortgage Corp. v. Gisvold*, 215 Wis. 2d 459, 470, 572 N.W.2d 466, 472 (1998).

Both parties rely on *Benjamin Plumbing II*. In that case, the contracting party, Benjamin Plumbing, sought the unpaid balance for a plumbing bill from the corporate agent, Whitcomb. *See Benjamin Plumbing II*, 162 Wis. 2d at 845, 470 N.W.2d at 891. Whitcomb objected, arguing that as a director of a nonstock corporation he was entitled to immunity from contractual liability pursuant to § 181.287, STATS. *See Benjamin Plumbing II*, 162 Wis. 2d at 845, 470 N.W.2d at 891. Benjamin Plumbing countered that Whitcomb never informed it that he was acting on behalf of a corporation. *See id.* at 844–46, 470 N.W.2d at 891–92. It produced the contract and correspondence to demonstrate Whitcomb's failure to expressly identify his principal's corporate status. *See id.* at 844, 846, 470 N.W.2d at 891–92. We agreed with Benjamin Plumbing that Whitcomb did not adequately disclose his

---

followed, there wasn't enough money in the company, and it was just a shell company.

. . . .

THE COURT: So corporate veil is out. Now, what was the other claim?

Additionally, the Capsavages again disclaim proceeding on a piercing the corporate veil theory in their appellate brief.

corporate principal. *See Benjamin Plumbing, Inc. v. Barnes*, 156 Wis. 2d 276, 282, 456 N.W.2d 628, 631 (Ct. App. 1990) (*Benjamin Plumbing I*), *aff'd*, 162 Wis. 2d 837, 470 N.W.2d 888 (1991). We held there was no evidence that Whitcomb disclosed that he was contracting on behalf of a corporation; therefore, he forfeited any right he might have had as a corporate officer to avoid personal liability in the transaction. *See id.*

Esser asserts that there is a critical difference between the facts of *Benjamin Plumbing II* and the present case. In *Benjamin Plumbing II*, Whitcomb was directly and personally involved in the transaction. Whitcomb communicated, negotiated and dealt with Benjamin Plumbing. *See Benjamin Plumbing II*, 162 Wis. 2d at 844, 470 N.W.2d at 891. He also signed the plumbing contract. *See id.* Unlike Whitcomb, Esser argues he had no direct involvement with the yacht purchase contract.

On the contrary, the Capsavages contend that Esser, like Whitcomb, was directly and personally involved in their transaction. Although Esser never communicated, negotiated or dealt with the Capsavages, they argue that his contractual liability "stems from his direct, personal, financial involvement and co-ownership of San Diego Sea Ray, an unincorporated entity." Supporting this argument, the Capsavages make two assertions: (1) Esser is not entitled to limited liability as a corporate shareholder because SDSR was not a corporation but a partnership or a joint venture; and (2) Esser's financial contributions to SDSR resulted in sufficient involvement in their yacht purchase agreement that, under *Benjamin Plumbing II*, he is personally liable for the undisclosed

414

corporate principal. We will deal with each contention separately.

First, it is undisputed that Sundance Marine is properly incorporated in the State of California. Also, the parties do not dispute that a fictitious name filing was made for Sundance Marine to do business as SDSR. The Capsavages ignore this fictitious name filing. They assert that "[SDSR] is some other kind of business entity—a joint venture or partnership." They support this assertion by dissecting the way the business was actually operated. Under their analysis, Esser is personally liable for the contract because he was a participant in the partnership. *See id.* at 849, 470 N.W.2d at 893. However, as we have noted, SDSR was a fictitious business name for Sundance Marine. When a corporation does business under another name, it does not create a distinct entity. *See Duval v. Midwest Auto City, Inc.*, 425 F. Supp. 1381, 1387 (D. Neb. 1977), *aff'd*, 578 F.2d 721 (8th Cir. 1978). Rather, SDSR is simply another way to refer to Sundance Marine. Accordingly, we disagree with the Capsavages' contention that SDSR is an unincorporated entity.

Next, we will evaluate the Capsavages' contention that Esser's financial contributions to SDSR resulted in sufficient involvement in their yacht purchase contract that he should be personally liable for the undisclosed corporate principal. We disagree and accept Esser's analysis that *Benjamin Plumbing II* requires more direct involvement in the transaction than was present in this case.

In *Benjamin Plumbing II*, the court held Whitcomb, the agent, personally liable for the undisclosed principal. *See Benjamin Plumbing II*, 162 Wis. 2d at 854, 470 N.W.2d at 895. However, the trial court had

dismissed claims against the other corporate officers; subsequently, we affirmed. *See Benjamin Plumbing I*, 156 Wis. 2d at 279, 456 N.W.2d at 629. "Because the other defendants . . . never had any dealings with Benjamin, they remain shielded from personal liability by reason of their status as corporate officers." *Id.* at 279 n.1, 456 N.W.2d at 629. Here, the Capsavages ask us to ignore this precedent and extend personal liability to a corporate officer uninvolved in the transaction at issue. We decline this overture.

After reviewing this issue, we determine that all the cases declare the same result when confronted with this same situation: only the agent who actually failed to disclose the principal or shareholders who either participated in or had knowledge of the undisclosed principal have been held personally liable. *See, e.g., Crolley v. Haygood Contracting, Inc.*, 411 S.E.2d 907, 910 (Ga. Ct. App. 1991) (trade name not sufficient disclosure of corporate principal and the contract-signing shareholder held liable); *Corporate Interiors, Inc. v. Randazzo*, 921 S.W.2d 124, 127 (Mo. Ct. App. 1996) (company's fictitious name not adequate disclosure of principal and agent who entered contract held liable); *New Eng. Marine Contractors, Inc. v. Martin*, 549 N.Y.S.2d 535, 536 (N.Y. App. Div. 1989) (shareholder liable for undisclosed principal after signing contract); *MAS Corp. v. Thompson*, 302 S.E.2d 271, 276 (N.C. Ct. App. 1983) (contract-negotiating shareholder held liable as agent for the undisclosed principal); *Cooper v. Hileman*, 222 N.W.2d 299, 300–02 (S.D. 1974) (agent of undisclosed principal held liable on contract that he negotiated, gave orders and authorized work to proceed).

For instance, when confronted with a similar scenario in *W.W. Leasing Unlimited v. Commercial*

*Standard Title Insurance Co.*, 197 Cal. Rptr. 118 (Cal. Ct. App. 1983), the California Court of Appeals held the *agent* personally liable for signing and disclosing only the corporation's trade name under which it did business. *See id.* at 119–20. In our case, the salesperson signed the yacht purchase agreement disclosing only the trade or fictitious name, not Esser.

Additionally, in *G.W. Andersen Construction Co. v. Mars Sales*, 210 Cal. Rptr. 409 (Cal. Ct. App. 1985), the court imposed liability on a corporate shareholder for an undisclosed corporate principal because the contracting party dealt with this person to execute the contract. *See id.* at 412–13. However, the court refused to extend liability to another shareholder who had no involvement in the transaction. *See id.* at 413. Therefore, whether to hold a corporate shareholder liable for an undisclosed principal turns on if the shareholder was directly involved in the transaction, thus acting as the corporation's agent.

Esser's financial involvement in SDSR does not meet this threshold. In *Benjamin Plumbing II*, the court stated, "Whitcomb's contractual liability to Benjamin Plumbing . . . stems from his position as an agent to a partially disclosed corporate principal and not from his status as a director . . . ." *Benjamin Plumbing II*, 162 Wis. 2d at 857, 470 N.W.2d at 896.

Additionally, the Capsavages' contention that Esser was personally involved because he misled customers like themselves into thinking that SDSR was a sufficiently capitalized operation as a result of the capital infusions he provided to SDSR is without merit. Esser made business decisions to invest in Sundance Marine and to continue investing in it even after he became aware of cash-flow problems. No inference can

be made that this was anything other than a legitimate business decision. The Capsavages produced no evidence that Esser's intention was to defraud SDSR's customers; as such, we reject their contention.

We conclude that Esser was not directly involved in the yacht purchase agreement or acting as an agent of SDSR. Thus, as a corporate shareholder, Esser cannot be personally liable for a contract entered into by the corporation's agent. *See Sprecher,* 78 Wis. 2d at 37, 253 N.W.2d at 498. Indeed, such a result would controvert the goal of corporate shareholders' limited liability: promoting commerce and industrial growth by allowing shareholders to make their capital contributions to corporations without subjecting all of their personal wealth to the risks of the business. *See Consumer's Co-op,* 142 Wis. 2d at 474, 419 N.W.2d at 213–14. Hence, we reverse the judgment attributing personal liability to Esser.[2]

*By the Court.*—Judgment reversed.

[2] Esser also questions the amount of damages awarded. Because we are reversing the judgment against him, we need not consider this issue. *See Gross v. Hoffman,* 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (concluding that if the decision issued on one point disposes of an appeal, then the appellate court will not decide other issues raised).