Vincent **INSOLIA** and Karen Insolia, Billy Mays and Phyllis Mays, Maureen Lovejoy and Lee Lovejoy, Charles Caldwell, personal representative of Charles Caldwell, Jr., Deceased, on behalf of themselves and as representatives of a class of all others similarly situated,

Physicians Plus Insurance Corporation, Wal–Mart Group Associates, Insurance, Champus, parties joined pursuant to Wis.Stat. sec. 803.03, Plaintiffs,

v.

**PHILIP MORRIS INCORPORATED; R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation; B.A.T. Industries P.L.C.; Lorillard Tobacco Company; Liggett Group Inc.; The Council for Tobacco Research— U.S.A., Inc.; and the Tobacco Institute Inc., Defendants.**

No. 97–C–0347–C.

United States District Court,
W.D. Wisconsin.

Dec. 14, 1998.

---

James A. Olson, Lawton & Cates, S.C., Madison, WI, for Insolia, Vincent, Insolia, Karen.Thomas J. Basting, Sr., Brennan, Steil, Basting & MacDougall, Janesville, WI, for State of Wisconsin. Richard Schmidt, Boardman, Suhr, Curry & Field, Madison, WI, for Physicians Plus Ins.

Michael T. Graham, Jackson, Lewis, Schnitzler and Krupman, Chicago, IL, for Associates' Health and Welfare.

Michael L. Zaleski, Quarles & Brady, Madison, WI, for Philip Morris Incorporated.

James Clark, Foley & Lardner, Milwaukee, WI, for R.J. Reynolds Tobacco Company.

Donald R. Peterson, Peterson, Johnson & Murray, S.C., Milwaukee, WI, for Brown & Williamson Tobacco Corp.

Ralph A. Weber, Reinhart, Boerner, Van Deuren Norris & Rieselbach, S.C., Milwaukee, WI, for B.A.T. Industries P.L.C.

Bruce A. Schultz, Coyne, Niess, Schultz, et al., Madison, WI, for Lorillard Tobacco Company.

Robert B. Raschke, Lindquist & Vennum, Minneapolis, MN, for Liggett Group Inc.

James F. Gebhart, Madison, WI, for Hill & Knowlton, Inc.

John H. Schmid, Axley Brynelson, Madison, WI, for The Council for Tobacco Research.

John Koeppl, Madison, WI, for The Tobacco Institute, Inc.

## OPINION AND ORDER No. 1

### CRABB, District Judge.

This is a civil action for declaratory and monetary relief brought by a group of individuals on behalf of a proposed class of Wisconsin residents, all of whom began smoking before 1964, consumed at least one package of cigarettes a day for twenty years and have been diagnosed with lung cancer. The defendants are the leading manufacturers of tobacco products in this country as well as two industry trade groups, the Council for Tobacco Research and the Tobacco Institute. One of these defendants, the Brown & Williamson Tobacco Corporation, is the indirect subsidiary of defendant B.A.T. Industries P.L.C., an English corporation. This court has jurisdiction over plaintiffs' state law claims of negligence, strict liability, intentional exposure to a hazardous substance and civil conspiracy under the diversity of citizenship statute. 28 U.S.C. § 1332.

The case is before the court on the motion of defendant B.A.T. to dismiss for lack of personal jurisdiction. B.A.T. maintains that it is not amenable to jurisdiction in Wisconsin because it has never transacted business in the state. Although B.A.T.'s indirect subsidiary, defendant Brown & Williamson, has sold cigarettes to Wisconsin residents, B.A.T. asserts that it does not manufacture or sell any products or services; it is only a holding company. For this reason, B.A.T. argues, it does not fall within the sweep of Wisconsin's long-arm statute and does not have the necessary minimum contacts with this state to satisfy the due process clause of the Fourteenth Amendment. Plaintiffs contend that documents created by defendant B.A.T. reveal that it is in fact a manufacturer of tobacco products, not a mere holding company. In the alternative, plaintiffs argue that jurisdiction is appropriate because defendant Brown & Williamson is either the "alter ego" or the agent of B.A.T. Finally, plaintiffs assert that the court may exercise jurisdiction over defendant B.A.T. even though it has no direct contacts with Wisconsin because defendant participated in an alleged conspiracy to create a phony scientific controversy about the link between smoking and disease.

I conclude that defendant B.A.T. is not amenable to jurisdiction under Wisconsin's long-arm statute or under the due process clause of the United States Constitution. References to tobacco products produced by "BAT" and "the Group" in documents created by defendant B.A.T. are not concessions that B.A.T. manufactures cigarettes. These references are either to another one of B.A.T.'s subsidiaries, non-party British American Tobacco Corporation, or are a collective term used to describe all of the companies owned by B.A.T. Though defendant B.A.T. sets the general policies followed by Brown & Williamson, there is no indication

that this control extends to the subsidiary's daily operations. In the absence of other indicia that would support piercing B.A.T.'s veil of limited liability, the degree of control demonstrated by plaintiffs is insufficient to permit the conclusion that Brown & Williamson is the alter ego of B.A.T. Plaintiffs have adduced no evidence that Brown & Williamson is the actual or apparent agent of defendant B.A.T. Even if Wisconsin courts would hold that the long-arm statute supported the exercise of personal jurisdiction over a nonresident defendant on basis of the nonresident's participation in a conspiracy, defendant B.A.T. has no contacts with Wisconsin, much less the minimum amount necessary to satisfy due process. Because the conspiratorial acts allegedly engaged in by B.A.T. have not been directed at Wisconsin, it is not possible to conclude that B.A.T. could have anticipated being haled into court in this state.

On a motion to dismiss for lack of personal jurisdiction, the burden of proof rests on the party asserting jurisdiction. *See Nelson v. Park Industries, Inc.,* 717 F.2d 1120, 1123 (7th Cir.1983). That party must make a prima facie showing that personal jurisdiction exists. *See id.* In deciding whether the party has made the necessary showing, the court may rely on the allegations of the complaint and also may receive and weigh affidavits submitted by the parties. *See id.* The court is to resolve all disputes concerning the relevant facts in favor of the party asserting personal jurisdiction. *See id.*

## FACTS

### A. *The Group*

The genealogy of all the corporate entities relevant to the disposition of this motion is rather complex. That virtually all of these entities are referred to colloquially as some combination of the letters B, A, and T does not help matters.

Defendant Brown & Williamson Tobacco Corporation manufactures and distributes tobacco products in Wisconsin; it is incorporated under the laws of Delaware. It is an indirectly owned subsidiary of defendant B.A.T. Industries, a public limited company incorporated under the laws of England and Wales in 1928. Before July 23, 1976, defendant B.A.T. was an investment company named Tobacco Securities Trust Company Limited. No entity known as B.A.T. Industries existed before this date. Neither B.A.T. nor its predecessor has ever manufactured, marketed, packaged, sold, distributed or advertised tobacco products or any other goods in the Wisconsin or anywhere else. Also on July 23, 1976, defendant B.A.T. became the sole ordinary shareholder in the British American Tobacco Company Limited, an English company that owns a number of subsidiaries engaged in the manufacture and marketing of tobacco products, including defendant Brown & Williamson. These subsidiaries also conduct research related to tobacco products. The British American Tobacco Company, or "BATCo," has been in continuous existence since its incorporation in 1902. It acquired the stock of defendant Brown & Williamson in 1927. Before July 23, 1976, BATCo was a publicly owned and traded company in which no shareholder held a controlling interest. Following the July 1976 transaction, BATCo continued its operations and retained its separate corporate existence and identity. Aside from changing its name from the Tobacco Securities Trust Company, defendant B.A.T. also retained its separate corporate existence and identity.

In 1978, BATUS, Inc. was incorporated under Delaware law as an indirect subsidiary and intermediate holding company of defendant B.A.T. BATUS became the direct holding company for defendant B.A.T.'s American subsidiaries. In 1950, Gimbel Brothers, Inc. formed a company under Wisconsin law named Esco Beverage Corporation. In 1980, BATUS acquired Esco and renamed it BATUS–Wisconsin, Inc. In 1990, as part of a corporate restructuring plan, BATUS, Inc. changed its named to BATUS Holdings, Inc. At the same time, BATUS–Wisconsin took the name BATUS, Inc. Despite this swap, BATUS Holdings is not the successor to BATUS–Wisconsin. As a result of this restructuring, BATUS Holdings and its parent, defendant B.A.T., divested themselves of all holdings in the United States retail and paper business, including Marshall Fields and

Appleton Papers, Inc., two businesses with operations in Wisconsin.[1]

Defendant B.A.T. has never employed more than 185 people, all of whom have been engaged in managing the company's investment interests. Presently, defendant B.A.T. has more than 500 subsidiaries. Collectively, defendant B.A.T. and its subsidiaries are known as the B.A.T. Group or simply the Group. "BAT" is a descriptive phrase used to refer either to defendant B.A.T. or to its subsidiary, BATCo. Since the 1976 transaction, defendant B.A.T. and defendant Brown & Williamson have maintained separate offices, employees, directors, officers, accounts, records and minutes. Defendant B.A.T. is neither licensed nor qualified to do business in Wisconsin. It pays no taxes, maintains no office and does not own, lease or control any real or personal property in Wisconsin.

### B. *Tobacco Industry Trade Groups*

Defendant Council for Tobacco Research, a non-profit corporation, is the successor in interest to the Tobacco Industry Research Committee. It is organized under the laws of New York. Defendant Council for Tobacco Research has represented knowingly and falsely that whether smoking causes adverse health effects is a matter of scientific controversy. It has done so on behalf of the tobacco industry to promote the sale cigarettes.

Defendant Tobacco Institute, a corporation organized under the laws of New York, is funded by the tobacco industry for the ultimate purpose of promoting the sale of cigarettes. It too has represented knowingly and falsely that a consensus does not exist among scientists whether smoking causes adverse health effects. To achieve these objectives, defendant Tobacco Institute has engaged in substantial activities in Wisconsin, including lobbying, advertising and bulk mailing.

### C. *Documents Circulated by Defendant B.A.T. to Its Subsidiaries*

In a company report filed with the United States Securities and Exchange Commission on April 7, 1995, defendant B.A.T. stated in part: "B.A.T. industries is one of the U.K.'s leading business enterprises with interests principally in tobacco and financial services. In tobacco the Group is the world's most international cigarette manufacturer, selling products in almost every country.... The Group operates in more than 90 countries, employing some 173,000." The report boasts that "Group companies are leading providers of personal financial and insurance services in the UK and North America. Principal operating companies [include] Farmers Group, [ ] the fourth largest group of property and casualty insurance companies in the USA."

A company-produced "Factfile" contains similar information, including many statements about defendant B.A.T.'s tobacco holdings. In many of the statements regarding cigarette production, brands and market share, attribution is to "BAT." For example, on page three, the publication states that "BAT sells about 250 brands, including some of the world's best known cigarettes."

A December 1995 newsletter published by defendant B.A.T. includes a cartoon originally published in *The Times of London.* The cartoon depicts a be-suited man puffing contentedly on a cigarette beneath a plaque that reads: "Smoking is good for your wealth." The man, presumably a BAT executive or shareholder, is reading a paper that proclaims defendant B.A.T. has reaped 1.8 billion pounds in pre-tax profits for the first nine months of 1995.

In July 1992 and 1993, defendant B.A.T. issued a policy directive entitled "Guidelines for Brown & Williamson." The guidelines are divided into three sections: general, financial and specific. The specific guidelines range from domestic and international sales targets to management and product quality objectives. For example, in the 1992 document, point nine states: "US Domestic Market: There should be an objective to increase market share, subject to the development of increased margins in VFM and maintaining market share in full revenue. The plan should set out the trade-offs between market

---

1. Between 1995 and 1998, defendant B.A.T. underwent a thorough restructuring. Mercifully, the inevitable name changes and realignment associated with this event are not relevant to defendant B.A.T.'s motion to dismiss.

decline, market share, mix, promotion and pricing." Point two, under the "general" heading, directs defendant Brown & Williamson to "work on projects as required by the Tobacco Strategy Group and [ ] assist the New Business Development Team of B.A.T. Industries in that body's evaluation of proposals to invest in new markets and to make acquisitions or disposals."

Other documents circulated by defendant B.A.T. to its subsidiaries, including defendant Brown & Williamson, contain directives related specifically to tobacco products liability lawsuits. A March 1984 memorandum entitled "Legal Considerations on Smoking Health Policy" emphasizes that "statements about cigarette smoking or the smoking and health issue generally must be factually and scientifically correct," and then goes on to provide the correct factual and scientific conclusions. Specifically, the memorandum states:

> No conclusive scientific evidence has been advanced and the statistical association does not amount to proof of cause and effect. Thus a genuine scientific controversy exists. The Group's position is that causation has not been proved. . . . Consequently the Group cannot participate in any campaigns stressing the benefits of a moderate level of cigarette consumption, of cigarettes with low tar and/or nicotine deliveries or any other positive aspects of smoking . . .

Sometime in 1995, defendant B.A.T. circulated a more comprehensive set of documents under the heading "Legal Considerations in Smoking & Health Issues." In a cover memorandum, a member of defendant B.A.T.'s board of directors, P.J. Ricketts, laid out the objective of the circular: "Recent changes in the law in some states in the U.S.A. have resulted in a fresh spate of litigation against the tobacco industry there. For this reason it is most important that other members of the Group are constantly aware of B.A.T. Industries' stance on Smoking & Health." Attached is an eleven page memorandum dated November 2, 1995, prepared by Anne Johnson. At the time, Johnson worked for BATCo. After discussing possible responses to the charge that smoking causes disease,

Johnson concluded by saying that "it is essential to emphasize both sides of the causation argument and not to give overdue weight to the evidence which contradicts the view that smoking causes disease."

### D. Legal Memoranda and Research Documents

On August 20, 1970, David Hardy, a lawyer in Kansas City, addressed a memorandum to the general counsel of defendant Brown & Williamson. Hardy speculated that if "a plaintiff should allege that BAT manufactures and sells cigarettes by and through its 'agent' and wholly-owned subsidiary, B & W, then BAT would probably be served through its 'agent' and might well remain a defendant" in a lawsuit. By "BAT," Hardy meant BATCo, not defendant B.A.T., which did not exist at the time.

In 1979, J. Kendrick Wells III and Ernest Pepples both worked for defendant Brown & Williamson. In two memoranda addressed to Pepples dated November 9 and June 15, 1979, Wells discussed "various alternatives for handling BAT scientific reports which come to B & W in a way that would afford some degree of protection against discovery." After rejecting one possibility as inconsistent with the notion that BATCo was acquiring the sensitive documents in anticipation of litigation, Wells proposed an alternative: "that all BAT scientific reports be shipped directly to Dr. Esterle under a formal arrangement that Dr. Esterle was assigned to be your agent for the acquisition of scientific materials in anticipation of litigation. Dr. Esterle would separate the reports which were relevant to smoking and health, or otherwise sensitive, for special handling as described below and place the routine reports into regular R & D circulation." In the June memorandum, Wells noted that "Jim Rosene has kept his eyes out for potentially sensitive material and has simply held them in his office." Later, Wells advised that "[c]ontinued Law Department control is essential for the best argument for privilege." Dr. Eserle and Jim Rosene also worked for defendant Brown & Williamson. Defendant B.A.T. has never received the type of documents referred to in Wells's memoranda. References

to "BAT" in these memoranda are to BATCo, not defendant B.A.T.

From February 10–14, 1979, there was a research and development policy conference. None of the participants worked for defendant B.A.T., but there are references in conference notes to the "B.A.T. Group." A similar conference took place five years earlier, from January 12–18, 1974. Again, none of the participants were employed by defendant B.A.T. Most likely, references in conference notes to "B.A.T." are to BATCo. Defendant B.A.T. did not exist at the time.

On June 12, 1984, Wells wrote a file note documenting a two-day meeting involving himself, "Trial Counsel," "BAT Legal" and someone named David Schechter. The general topic of discussion was products liability litigation in the United States. In particular, attendees discussed the potential disclosure of scientific documents. References to BAT are to BATCo, not defendant B.A.T.

In a January 17, 1985, file note, Wells documented a meeting with Earl Kohnhorst in which the two discussed removing "deadwood" from research and development archives. Wells made the following recommendation: "I said we would consider shipping the documents to BAT when we had completed segregating them. I suggested that Earl tell his people that this was part of an effort to remove deadwood from the files and that neither he nor anyone else in the department should make any notes, memos or lists."

On July 8, 1985, Sidney Rosdeitcher, a lawyer in Washington, D.C., addressed a addressed a memorandum to David Schechter. Rosdeitchter opened the memorandum by stating: "You have asked us to consider hypothetically whether documents in the possession of B.A.T. Industries or its U.K. subsidiary, BATCo, could be discovered by a plaintiff in a U.S. lawsuit against Brown & Williamson."

On February 17, 1986, Wells sent yet another memorandum to Pepples covering the issue of document management. The subject heading is listed as "BAT Science." Wells discussed the plan for receiving "reports from certain projects to be done at the laboratories of affiliated companies." Wells outlined a proposal and related strategic considerations:

B & W will receive concise reports, estimated to be about one-half page in length, twice each year for each project it wishes to follow. While the brevity of the reports will reduce the potential for receipt by B & W of information useful to a plaintiff, disadvantageous information could be included and the reports could serve as road maps for a plaintiff's lawyer.

A January 17, 1990, meeting agenda focused on the "[c]oncern about [the] volume of research documentation spread around the group." Among other concerns, the agenda discusses the need for "[r]egular lawyer reviews and audits of scientific documents produced in each company," and questions whether "the lawyers [are] sufficiently educated about the problems that can arise in relation to research documentation[.]" At the bottom of this document are the typewritten initials MBC/CEC.

## OPINION

### I. ATTORNEY–CLIENT PRIVILEGE

Although not a moving party on this motion, defendant Brown & Williamson has interceded to object to the use of certain exhibits submitted by plaintiff. Defendant Brown & Williamson maintains that these documents are protected by attorney-client privilege but has insisted that this gesture should not be construed as a formal invitation for the court to issue a definitive ruling on the subject and has made no evidentiary showing to support its assertion. Instead, defendant Brown & Williamson has explained that it wishes simply to preserve its objections for the record. These objections are noted. The contested exhibits have received the court's full consideration and have been incorporated into the factual allegations recounted above.

### II. MOTION TO DISMISS

#### A. *Introduction*

In a case based on diversity of citizenship, a federal court has personal jurisdiction over a non-consenting, nonresident de-

fendant to the extent authorized by the law of the state in which that court sits. *See Giotis v. Apollo of the Ozarks, Inc.*, 800 F.2d 660, 664 (7th Cir.1986). This inquiry is a two-step process. First, the court must consider whether Wisconsin's long-arm statute subjects a nonresident defendant to personal jurisdiction. *See Marsh v. Farm Bureau Mut. Ins. Co.*, 179 Wis.2d 42, 52, 505 N.W.2d 162, 165 (Ct.App.1993) (citations omitted). If jurisdiction is appropriate under the long-arm statute, the burden shifts to the defendant to show that the exercise of personal jurisdiction would not comport with the due process requirements of the Fourteenth Amendment. *See Steel Warehouse of Wisconsin, Inc. v. Leach*, 154 F.3d 712, 714 (7th Cir.1998). Whether the court is analyzing jurisdiction in the context of a state long-arm statute or the due process clause, the operative consideration "remains whether the defendant purposefully established 'minimum contacts' in the forum state." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

■ The nature, quality and quantity of contacts necessary to establish jurisdiction depend on the type of jurisdiction asserted: general or specific. When general jurisdiction exists, a nonresident defendant may be sued in the state regardless of the subject matter of the lawsuit. To establish general jurisdiction, the nonresident defendant must have "continuous and systematic" contacts with the forum. *Helicopteros Nacionales de Columbia, S.A v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Specific jurisdiction may exist when the contacts fall below this threshold, but only if claims arise out of or are related to these limited contacts. *See id.* at 418 n. 12, 104 S.Ct. 1868.

■ A brief description of Wisconsin's long-arm statute and applicable due process requirements is appropriate. Wisconsin's long-arm statute should be liberally construed in favor of the exercise of personal jurisdiction. *See Federated Rural Electric Ins. v. Inland Power & Light*, 18 F.3d 389, 391 (7th Cir.1994) (citations omitted). The statute accommodates general and specific jurisdiction through different provisions. For example, Wis.Stat. § 801.05(1)(d) establishes jurisdiction over a defendant with a "local presence ... engaged in substantial and not isolated activities" within Wisconsin. *See also Jadair, Inc. v. Van Lott, Inc.*, 512 F.Supp. 1141, 1143 (E.D.Wis.1981) ("In applying this subsection a court looks to the defendant's general contacts with the forum state and not merely to its contacts arising out of the specific transaction at issue."). In comparison, § 801.05(3) applies to cases involving an injury "arising out of an act or omission [in Wisconsin] by the defendant." This is a specific jurisdiction provision: rather than focusing on a defendant's general contacts with the state, it is concerned solely with those acts related to the claimed injury. Though such contacts need not be "substantial," as they must under § 801.05(1)(d), there must be some sort of causal relationship between the local contacts and the injury.

■ Implicit in the minimum contacts requirement imposed by the due process clause is the notion that a court may not exercise personal jurisdiction over a defendant "under circumstances that would offend traditional notions of fair play and substantial justice." *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (quoting *International Shoe*, 326 U.S. at 316, 66 S.Ct. 154). This facet of the due process analysis is a function of four interests: 1) the forum state's interest in adjudicating the dispute; 2) the plaintiff's interest in obtaining convenient and effective relief; 3) the judicial system's interest in obtaining the most efficient resolution to the controversies; and 4) the burden on the defendant. *See Asahi*, 480 U.S. at 113, 107 S.Ct. 1026 (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

### B. *General Jurisdiction*

■ Plaintiffs concede that defendant B.A.T. has no direct contacts with Wisconsin but maintain that the exercise of general jurisdiction is appropriate because of the contacts of its subsidiary, defendant Brown &

Williamson. According to plaintiffs, the court has general jurisdiction over defendant B.A.T. because defendant Brown & Williamson is an "alter ego" of B.A.T. This theory of jurisdiction encompasses plaintiffs' assertion that no meaningful distinction should be drawn between B.A.T. and Brown & Williamson for the purpose of jurisdictional analysis because B.A.T. has held itself out as a cigarette manufacturer. Though plaintiffs present this argument as a separate basis for jurisdiction, the notion that these companies are abusing the corporate form to escape liability is not a free-standing theory of jurisdiction. Instead, it is one of many factors used to determine whether B.A.T. is the alter ego of Brown & Williamson. This principle will be addressed at greater length below.

■■■■■ By itself, the existence of a parent-subsidiary relationship is insufficient to support personal jurisdiction over a nonresident parent whose subsidiary has insufficient contacts with the forum state. *See Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336, 45 S.Ct. 250, 69 L.Ed. 634 (1925); *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir.1983). Courts begin with the presumption of corporate separateness. *See id.* at 465. This presumption can be rebutted only if "there is a basis for piercing the corporate veil and thus attributing the subsidiaries' torts to the parent...." *IDS Life Insurance Co. v. SunAmerica Life Insurance Co.*, 136 F.3d 537, 540 (7th Cir.1998). Disregard of corporate formalities is a factor considered by Wisconsin courts when determining whether to pierce a corporation's "veil" of limited liability. *See Consumer's Co-op of Walworth County v. Olsen*, 142 Wis.2d 465, 483, 419 N.W.2d 211, 217 (1988). Other courts confronted with this issue in the context of personal jurisdiction have focused on an additional factor: whether the parent managed the subsidiary with a degree of control "greater than that normally associated with common ownership and directorship." *Hargrave*, 710 F.2d at 1160; *see also Donatelli v. National Hockey League*, 893 F.2d 459, 466 (1st Cir.1990). This factor is borrowed from the so-called "alter ego" doctrine, applicable to shareholders who exert "not mere majority or complete stock control, but complete domination ... so that the cor-

porate entity [has] ... no ... separate existence of its own." *Consumer's Co-op*, 142 Wis.2d at 484, 419 N.W.2d at 217. In such cases, the corporate form is cast aside and the shareholders become liable for acts and debts attributable to the corporation.

Recently, the Court of Appeals for the Seventh Circuit has emphasized that "[p]arents of wholly owned subsidiaries necessarily control, direct and supervise the subsidiaries to some extent" but anything less than the degree of control necessary to pierce the parent corporation's veil of liability is insufficient to establish personal jurisdiction over the parent. *See IDS*, 136 F.3d at 540. This holding is consistent with *Hargrave*, in which the Fifth Circuit articulated a similarly rigorous standard for determining when a parent's control of its subsidiary justified attributing the subsidiary's local contacts to the parent. The court began by noting that "100% stock ownership and commonality of directors and officers are not alone sufficient to establish an alter ego relationship between two corporations." *Hargrave*, 710 F.2d at 1160. Although the parent exercised complete authority over its subsidiary's general policy decisions, the court found it significant that the companies kept separate accounting and bookkeeping systems and that the subsidiary maintained responsibility for day-to-day operations. *See id. IDS* and *Hargrave* are of particular significant to this case because plaintiffs' alter ego theory of jurisdiction is based on little more than the degree of control exerted by defendant B.A.T. over defendant Brown & Williamson. Plaintiffs have made no allegations and produced no evidence regarding the other factors traditionally part of a veil-piercing analysis. For example, there is no suggestion that defendant Brown & Williamson is undercapitalized, has not kept proper records or that its officers and directors have not carried out their duties. *Cf. Consumer's Co-op*, 142 Wis.2d at 484, 419 N.W.2d at 217; *Olen v. Phelps*, 200 Wis.2d 155, 163, 546 N.W.2d 176, 181–182 (Ct.App.1996).

The degree of control exercised by defendant B.A.T. over defendant Brown & Williamson is insufficient to justify a conclusion that B.A.T. is the alter ego of its subsidiary.

Plaintiffs have managed to show that defendant B.A.T. has set broad policy directives for Brown & Williamson on an annual basis. Without exception, these objectives are confined to relatively commonplace concerns such as anticipated profits and sales, brand strength and product quality. Other exhibits support plaintiffs' allegation that B.A.T. has played a role in an alleged conspiracy to spread misinformation about the adverse health effects of smoking and to shield sensitive documents with false claims of attorney-client privilege. For example, one of the exhibits produced by plaintiffs is a memorandum written by P.J. Ricketts, a member of the board of directors of B.A.T. In this memorandum, Ricketts discussed the need for all of subsidiaries to understand B.A.T.'s "stance" on smoking and health. As outlined in another memorandum accompanying Rickett's missive, this stance amounted to emphasizing lingering scientific doubts regarding the causal link between smoking and disease, such as playing up other factors that may contribute to the onset of tobacco-related illness, but not placing too much weight on this evidence. Some allegations related to the alleged conspiracy are disputed. For example, plaintiffs allege that defendant Brown & Williamson shipped sensitive scientific documents to defendant B.A.T. and have produced exhibits supporting this assertion, including the January 1985 memorandum regarding the shipment of "deadwood" to "BAT." Also, the July 1985 memorandum written by a Washington, D.C. lawyer supports the notion that B.A.T. was concerned about the potential discovery of sensitive documents in its possession. In response, an officer of defendant B.A.T. has averred that the company has not received shipments of documents from defendant Brown & Williamson. *See* Aff. of Peter L. Clarke, dkt. # 144, at ¶ 25. As already indicated, on a motion to dismiss for lack of personal jurisdiction, such disputes are resolved in favor of the party asserting jurisdiction. Referring to paragraph 25 of this same affidavit, defendant B.A.T. maintains that the January 1990 meeting agenda addressing lawyer control of scientific research documents was not written by one of its employees. However, neither the affidavit nor the agenda itself supports this assertion.

Despite this evidence regarding the degree of control exercised by B.A.T over Brown & Williamson, there is no suggestion that B.A.T. has any responsibility for the daily operations of Brown & Williamson, much less the type of dominating control contemplated by the alter ego doctrine. Indeed, it is virtually inconceivable that a company of fewer than 200 employees could oversee the tens of thousands of workers employed by defendant Brown & Williamson while, at the same time, exert some control over 499 other subsidiaries.

Apart from the issue of control, there are no indicia that defendants B.A.T. and Brown & Williamson have disregarded corporate formalities. Plaintiffs point to various publications and filings circulated by defendant B.A.T. that contain boasts about the prowess of "BAT" and the "the Group" as a cigarette manufacturer. Presumably, plaintiffs believe that these references are evidence that the intricate corporate structure of defendant B.A.T and its various subsidiaries is a sophisticated ruse constructed to hide the reality that there is no legally meaningful distinction between parent and subsidiary. In plaintiffs' words, "Defendant BAT is playing a corporate shell game for the very purpose of insulating itself from liability while protecting its huge profits generated from cigarettes." Pl.'s Br. in Opp., dkt. # 117, at 2. Although this may be true, for better or worse, defendant B.A.T. is entitled to play such a game. Without question, one of the dominant benefits of incorporation is limited liability. To overcome this jurisdictional obstacle, plaintiffs must do more than demonstrate that there is a confusing similarity among the acronyms used to refer to defendant B .A.T. and its subsidiaries. Plaintiffs have cited no authority to support the propositions that these practices are improper. To the contrary, there are rather obvious, benign explanations behind the use of these generic terms. Defendant B.A.T. has shown that its intermediate holding company, the British American Tobacco Corporation, is commonly referred to as BAT. Similarly, references in these same documents to the accomplish-

ments of "the Group" are not confessions that defendant B.A.T. actually manufactures and markets the tobacco products sold by its subsidiaries. B.A.T. and the Group are not the same entity. The Group is a collection of many corporations; the financial state of affairs of these corporations cannot be represented accurately to shareholders and regulators without some discussion of the type of business engaged in by individual members of the conglomerate. In this sense, the Group does manufacture and market cigarettes because several of its constituent members do. In another, more important sense, the corporation that owns all of the entities that make up the Group, defendant B.A.T., enjoys a separate legal identity.

Plaintiffs ask the court to follow a more lenient standard for determining whether a subsidiary's contacts with a forum state should be imputed to its nonresident parent company. Under this standard, a degree of control sufficient for exercising personal jurisdiction is established when a parent owns 100% of a subsidiary's stock, shares common officers with its subsidiary and issues consolidated financial statements. This standard is based on a series of cases from the Eastern District of Wisconsin. *See Hayeland*, 847 F.Supp. at 634; *Brunswick*, 575 F.Supp. at 1421; *Handlos v. Litton Industries, Inc.*, 304 F.Supp. 347, 350-51 (E.D.Wis.1969). With respect, I find the holdings from these cases unpersuasive in light of *IDS* and the other circuit court opinions in which plaintiffs have been held to a much more rigorous standard. These *opinions from the Eastern District* give too little weight to the separate corporate identities of independent corporations.

### C. *Specific Jurisdiction*

 Plaintiffs argue that the court may exercise specific jurisdiction over defendant B.A.T. through the actions of its agent, defendant Brown & Williamson. In the alternative, plaintiffs contend that jurisdiction under Wisconsin's long-arm statute is appropriate because B.A.T. is part of conspiracy to defraud the public about the health effects of smoking. As an initial matter, I note that plaintiffs have framed their agency theory as an argument for general jurisdiction. This is incorrect. Both the Wisconsin

and federal court of appeals have discussed this issue in the context of subsection four of the long-arm statute, a provision that confers *specific* jurisdiction over an out-of-state defendant. *See Pavlic v. Woodrum*, 169 Wis.2d 585, 590-591, 486 N.W.2d 533 (Ct. App.1992); *Stauffacher v. Bennett*, 969 F.2d 455, 458 (7th Cir.1992). In particular, these courts have cited language from the statue that authorizes jurisdiction over an out-of-state defendant provided there is an in-state injury and that "solicitation or service activities were carried on within this state by or on behalf of the defendant[.]" Wis.Stat. § 801.05(4)(a). Under *Pavlic* and *Stauffacher*, "solicitation ... on behalf of the defendant" means that a principal-agent relationship must exist between the defendant and the solicitor. No other provision in the statute supports the exercise of jurisdiction based on an agency theory.

### 1. *Agency*

 A principal-agent relationship exists "only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." *See Johnson v. Minnesota Mutual Life Insurance Co.*, 151 Wis.2d 741, 748, 445 N.W.2d 736, 738 (Ct.App.1989) (quoting *Restatement (Second) of Agency* § 15 (1957)). Where, as here, no explicit authorization exists, a court may find so-called implied or apparent agency provided the following three factors are established: 1) acts by the agent or principal justifying belief in the agency; 2) knowledge of these acts by the party sought to be held responsible as a principal or as an agent; 3) reliance on the existence of the relationship by plaintiffs, consistent with ordinary care and prudence. *See Schaefer v. Dudarenke*, 89 Wis.2d 483, 489-490, 278 N.W.2d 844, 847 (1979). By itself, the mere existence of a parent-subsidiary relationship is insufficient to establish that a principal-agent relationship exists between the two entities. *See Flintridge Station Associates v. American Fletcher Mortgage Co.*, 761 F.2d 434, 437 (7th Cir.1985) (citing *Matter of Chrome Plate, Inc.*, 614 F.2d 990, 996 (5th Cir.1980)).

Plaintiffs back up their position that defendant Brown & Williamson has acted as an agent of defendant B.A.T. with two unremarkable allegations. First, B.A.T. has profited from the commercial activities of its subsidiary in Wisconsin. Second, B.A.T. "ratified B & W's actions within Wisconsin," Dkt. # 117 at 31, a reference to the 1992 and 1993 policy guidelines issued by B.A.T. to Brown & Williamson. By this logic, virtually *every* parent-subsidiary relationship would be a principal-agent relationship as well. After all, it is unlikely that many parent corporations exert no influence over their subsidiaries or do not benefit financially from the economic success of their subsidiaries.

2. *Conspiracy*

Plaintiffs argue that this court may exercise jurisdiction over defendant B.A.T. because it participated in a civil conspiracy to suppress scientific information regarding the adverse health effects of smoking and create a bogus scientific controversy regarding the addictive properties of nicotine and harmful effects of tobacco products. Wisconsin courts have not recognized a theory of specific jurisdiction based on allegations that a nonresident is part of a conspiracy. *See Stauffacher,* 969 F.2d at 460. However, the Seventh Circuit has emphasized that district courts must base their exercise of personal jurisdiction on the forum state's long-arm statute and not on an "independent federal 'civil co-conspirator' theory of personal jurisdiction." *Davis v. A.J. Electronics,* 792 F.2d 74, 76 (7th Cir.1986). This caveat does not bode well for plaintiffs because there is no explicit textual support in Wis.Stat. § 801.05 for jurisdiction founded on allegations of a conspiracy. As already explained, subsection 4(a) of the statute applies only to the extent that a nonresident defendant has contacts with Wisconsin through the actions of an agent. For this reason, it is dubious whether Wisconsin's long-arm statute would support the exercise of jurisdiction over defendant B.A.T. on the basis of plaintiffs' novel conspiracy theory. Regardless, there is no need to forge ahead into these uncharted waters without the guidance of a state court ruling because it is clear that jurisdiction under this theory would not comport with

due process. Defendant B.A.T. does not have the necessary minimum contacts with this forum.

This conclusion is supported by Supreme Court precedent. In *Asahi,* 480 U.S. 102, 107 S.Ct. 1026, the Supreme Court ruled that a Japanese manufacturer of tire valves could not be drawn into court in California, even though the manufacturer knew that some of its valves were being used in the state. *See id.* at 112–13, 107 S.Ct. 1026. The exercise of jurisdiction would not comport with due process because the Japanese manufacturer did not advertise or solicit business in California and "did not create, control or employ the distribution system that brought its valves to California." *See* 408 U.S. at 112, 92 S.Ct. 2294.

In the absence of solicitation, physical presence or some other direct contact with a forum, purposeful availment may be established by showing that a defendant directed an act intentionally at the forum. For example, *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), concerned a California actress who brought suit for libel and invasion of privacy against the publisher and writer of a tabloid news article, both of whom lived and worked in Florida. Upholding the exercise of jurisdiction, the Court emphasized the geographic "focal point" of the defendants' conduct:

> The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California.

*Id.* at 788–789, 104 S.Ct. 1482. Elaborating on *Calder,* the Seventh Circuit has noted that the plaintiff did more than show that an out-of-state act engaged in by the magazine publisher and writer caused some injury within the forum state; they "had also 'entered' the state in some fashion, as by the sale ... of the magazine containing the defamatory material." *See Indianapolis Colts, Inc. v. Met-*

*ropolitan Baltimore Football Club Limited Partnership*, 34 F.3d 410, 411 (7th Cir.1994). Though the court of appeals declined to declare whether this additional factor is mandatory, *see id.*, there was no need to do so. In an earlier case, *Wallace v. Herron*, 778 F.2d 391, 394 (7th Cir.1985), the Seventh Circuit stated unequivocally: "We do not believe that the Supreme Court, in *Calder*, was saying that any plaintiff may hale any defendant into court in the plaintiff's home state, where the defendant has no contacts, merely by asserting that the defendant has committed an intentional tort against the plaintiff." Elaborating further, the Seventh Circuit concluded that its position was supported by the Court's opinion in *Burger King*, a case decided after *Calder*. In particular, the court of appeals attributed special significance to the following quote from *Burger King*, 471 U.S. at 474, 105 S.Ct. 2174: "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State."

From this discussion of Supreme Court precedent, I am persuaded that plaintiffs cannot establish personal jurisdiction over defendant B.A.T. on the basis of B.A.T.'s alleged role as a conspirator. Defendant B.A.T. is not connected to the cigarettes sold by defendant Brown & Williamson in Wisconsin, whether as a manufacturer or as the principal of its indirect subsidiary. To the extent that B.A.T. participated in the alleged conspiracy to spread misinformation about the adverse health effects of smoking, the geographic focal point of its participation was not Wisconsin, but all of North America. B.A.T.'s "focus," or lack thereof, is simply too diffuse to say that it could have anticipated being haled into court in Wisconsin. Even assuming that defendant B.A.T. could have foreseen that the actions it took in furtherance of the alleged conspiracy would eventually have some impact in Wisconsin, foreseeability is not a sufficient substitute for purposefully established contacts. *See World–Wide Volkswagen*, 444 U.S. at 295, 100 S.Ct. 559 ("[F]oreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause.")

**D.** *Additional Discovery*

Plaintiffs have asked the court for more time to conduct additional discovery regarding jurisdiction. Plaintiffs filed this case over a year and a half ago. As defendant B.A.T. has observed, about one year ago it produced more than 15,000 pages of documents related to its jurisdictional contacts throughout the United States, including Wisconsin. In other words, a decision on this motion is not premature and discovery in this case regarding this issue has been extensive, both in scope and time. At this point, with trial only six short months away, allowing further opportunity for plaintiffs to continue a search for jurisdictional facts would serve no legitimate purpose.

### ORDER

IT IS ORDERED that the motion to dismiss for lack of personal jurisdiction of defendant B.A:T. Industries P.L.C. is GRANTED.