**FARMERS INSURANCE EXCHANGE, et al., Plaintiffs,**

v.

**William E. SORENSON, and Bill E. Sorenson Agency, Inc., Defendants.**

**No. 00–C–379.**

United States District Court, E.D. Wisconsin.

June 7, 2000.

Timothy J. Gerend, Peter C. Woodford, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for plaintiffs.

James W. Hammes, Cramer, Multhauf & Hammes, Waukesha, WI, for defendants.

**DECISION AND ORDER**

RANDA, District Judge.

This matter comes before the Court on plaintiffs' motion for a preliminary injunction. Plaintiffs, Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid–Century Insurance Company, and Farmers New World Life Insurance Company (collectively "Farmers") claim that the defendants, William E. Sorenson ("Sorenson") and Bill E. Sorenson Agency, Incorporated ("Sorenson Agency") are causing Farmers irreparable harm. Sorenson is a former Farmers insurance agent and is currently soliciting business from his former policyholders. The Court held an evidentiary hearing in this matter on May 30, 2000. Farmers' request for a preliminary injunction is granted.

**I**

In January of 1987, Sorenson became a Farmers agent when he signed an Agent Appointment Agreement (the "Individual Agreement"). (Pls.' Br. in supp. of inj. at 3.) In January of 1996, Sorenson decided to incorporate as the Sorenson Agency. To reflect this change, on February 6, 1996, Sorenson entered into a Corporate Agent Appointment Agreement with Farmers (the "Corporate Agreement"). Sorenson signed the Corporate Agreement as president and sole shareholder of the Sorenson Agency. (Id. at 4.)

The Corporate Agreement defines the Sorenson Agency as the "AGENT" of Farmers. The Corporate Agreement provides:

H. In the event of termination of this Agreement, ... the COMPANIES will pay "Contract Value" defined below....

a. *CONTRACT VALUE* —Contract Value is based upon (1) the amount of service commissions paid by the COMPANIES to the AGENT on its active policies during either the six-month or

twelve-month period immediately preceding termination, (2) the number of policies in the AGENT'S active code number, (3) the number of years of continuous service as an Agent for the COMPANIES immediately prior to termination....

b. *UNDERWRITING CONTRACT VALUE BONUS*—An AGENT who meets underwriting Contract Value Bonus qualifications established by the COMPANIES will be awarded an Underwriting Contract Value Bonus in accordance with programs and schedules published from time to time by the COMPANIES. Entitlement to the Underwriting Contract Value Bonus will be evidenced in certificates issued to qualifying AGENTS annually. These certificates shall state said bonus in terms of percentages and shall be fully vested when received, based on the Contract Value at the time of termination, in accordance with the bonus program. Upon vesting, the percentage of Underwriting Contract Value Bonus will inure to the benefit of the AGENT, and its assigns, and may not be reduced.

The Underwriting Contract Value Bonus will be paid in accordance with paragraph H. However, where there is a sale pursuant to Paragraph G, said Bonus will be paid to the selling AGENT in one lump sum.

Contact Value amounts payable as an Underwriting Contract Value Bonus will be paid in not less than three equal installments and at not less than six month intervals. However, when Contract Value is $5,000 or less, the AGENT may elect to receive Contract Value and amounts payable as an Underwriting Contract Value Bonus, in one lump sum.

c. *The AGENT* may elect to receive Contract Value in three or more equal annual installments, the first to be paid upon termination. If the AGENT so elects, the COMPANIES will pay simple interest on any unpaid balance of Contract Value at a rate equal to the rate paid by Farmers New World Life Insurance Company on its premium deposit fund at the time any installment becomes due.

I. *The AGENT* agrees to transfer and assign all of the AGENT'S interest under this Agreement and Agency (including at the request of the COMPANIES, any interest in the telephone numbers and leased or rented office location) to the COMPANIES at the time of payment or tender of payment pursuant to paragraph H of this agreement. In the event they make payment to the AGENT pursuant to Paragraph H, the AGENT and the undersigned shareholders agree to accept tender of Contract Value and further agree that for a period of one year following the date of payment or tender of payment the AGENT will neither directly or indirectly solicit, accept, or service the insurance business of any Policyholder of record in the agencies of this district as of the date of payment or tender of payment.

J. *The AGENT* and the undersigned shareholders acknowledge that all manuals, lists and records of any kind (including information pertaining to policyholders and expirations) are the confidential property of the COMPANIES and agree they shall not be used or divulged in any way detrimental to the COMPANIES and shall be returned to the COM-

PANIES upon termination of the AGENCY;

. . . . .

M. The undersigned shareholders hereby agree to carry out and perform all of the terms and provisions of and be subject to all of the conditions and liabilities imposed on the AGENT under this APPOINTMENT AGREEMENT and shall not violate directly or indirectly any provisions hereof.

(Corporate Agreement ¶¶ H–J, M.)

Farmers is a group of insurance exchanges which operates its business through a network of "captive" agents.[1] As opposed to independent insurance agents that may offer products from a variety of insurance companies, each Farmers agent agrees to submit to Farmers every request or application for insurance for the classes and lines of insurance underwritten by Farmers. (Corporate Agreement ¶ B.1.)

In May 1998, Sorenson formed a new corporation known as PIAA, Inc. ("PIAA"). (Defs.' Br. in opp'n to inj. at 2.) Sorenson owned 90% of the common stock of PIAA, Inc. and the remaining 10% was owned by Mary Roemer. In May, 1998, PIAA, Inc. purchased the assets of an existing independent insurance agency known as Personalized Insurance Agency ("PIA"). Between May 1998 and January 1, 2000, Sorenson concurrently operated the Sorenson Agency, the Farmers agency in Neenah, Wisconsin, and PIA, the independent insurance agency in Appleton, Wisconsin. (Id. at 3.) The two offices are separated by a distance of approximately five miles.

Prior to purchasing PIA, Sorenson maintained his own separate set of files for his Farmers clients. In these separate files, Sorenson collected information which he obtained from Farmers policyholders, including the policyholder's name, the number and types of automobiles owned by the policyholder, information regarding the policyholder's residence and business properties, and the amount and type of insurance coverages which he had written for the policyholder. (Defs.' Br. in opp'n to inj. at 3.) Sorenson reviewed and updated this set of files after he decided to terminate the Corporate Agreement but before he notified Farmers of this decision. (Id. at 4.) Prior to leaving Farmers, Sorenson also downloaded Farmers' computer files into a General Casualty Insurance Company ("General Casualty") database. These computer files contain information similar to that contained in Sorenson's separate files. General Casualty is one of Farmers' direct competitors and is among the insurance providers offered by PIA, Sorenson's independent insurance agency.

The Corporate Agreement could be terminated by either party after three months written notice. In the event of breach, however, the Corporate Agreement could be terminated immediately. (Corporate Agreement ¶ D.1.) On January 1, 2000, Sorenson first notified Farmers that the Sorenson Agency was terminating the Corporate Agreement. By letter dated January 12, 2000, Sorenson indicated his desire to terminate the Corporate Agreement "immediately by mutual consent." Farmers subsequently terminated Sorenson on January 19, 2000, and at the same time tendered the first payment of Sorenson's Contract Value under paragraph H(b) of the Corporate Agreement. Sorenson has been actively soliciting and writing new policies for his former policyholders. (Defs.' Br. in opp'n to inj. at 4.) Sorenson has returned Farmers' property, but has not turned over the phone number and the lease for his Farmers office space. In addition, Sorenson has not turned over the separate set of Farmers policyholder files that he created or the database that he downloaded into General Casualty's computer system.

---

1. The "captive" agents are independent con- tractors with Farmers.

## II

A party seeking a preliminary injunction under Federal Rule of Civil Procedure 65 must demonstrate the following:

(1) the movant has some likelihood of succeeding on the merits,

(2) the movant has no adequate remedy at law and that the movant will suffer irreparable harm if preliminary relief is denied,

(3) the irreparable harm to the moving party if injunctive relief is denied outweighs the harm to the non-moving party if relief is granted, and

(4) the public interest favors injunctive relief, meaning the consequences of granting or denying the injunction to non-parties.

*Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992) (citations omitted). Factors one and three are related under the Seventh Circuit's 'sliding scale' approach. "[T]he more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side, the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Id.* (citations omitted).

Plaintiffs have shown a high likelihood of success on the merits of their contract claims.[2] Under paragraph I of the Corporate Agreement, the Sorenson Agency agrees not to solicit any business from Farmers' policyholders within Sorenson's former district. Sorenson admits that he is currently soliciting business from his former policyholders. Sorenson's contentions that paragraph I is inapplicable are without merit.

■ Sorenson argues that paragraph I's one year covenant not to compete does not apply to him, as the relevant clause only obligates the "AGENT," previously defined as the Sorenson Agency. Sorenson claims that his incorporated agency is bound by the covenant not to compete, but that he is not bound in his individual capacity. Sorenson argues that he has not breached his contractual obligations to Farmers as he is soliciting Farmers' policyholders in his individual capacity. To support his contention, Sorenson argues that clauses which are intended to apply to him as an individual specifically reference the "AGENT and the undersigned shareholders." However, Corporate Agreement paragraph M explicitly states that "[t]he undersigned shareholders hereby agree to carry out and perform all of the terms and provisions of and be subject to all of the conditions and liabilities imposed on the AGENT ... and shall not violate directly or indirectly any provisions hereof." (Corporate Agreement ¶ M).

General principles of contract interpretation require the Court to give effect to each provision of the contract. *See Jones v. Jenkins*, 88 Wis.2d 712, 722, 277 N.W.2d 815, 819 (1979). "Courts must read contracts to give a reasonable meaning to each provision and avoid a construction that renders portions of a contract meaningless.... [I]f possible, contradictory statements in a contract must be harmonized...." *Isermann v. MBL Life Assurance Corp.*, 231 Wis.2d 136, 605 N.W.2d 210, 217 (Ct.App.1999). Defendants attempt to interpret paragraph I's omission of "shareholders" in the relevant clause as an implicit contradiction to paragraph M. The Court disagrees. Paragraph I and paragraph M can be read together without contradiction, as paragraph I imposes the covenant *not to compete* only on the Sorenson Agency but paragraph M imposes those duties on Sorenson, as the lone shareholder of the Sorenson Agency. The Court refuses to interpret the contract in a way which renders paragraph M ineffective in this instance.

In addition, "[s]o far as reasonably practicable, a contract should be given a con-

---

**2.** Farmers is also highly likely to succeed on its duty of loyalty claims. However, the harm to the plaintiffs from these claims is not ongo-

ing, therefore, these claims do not support a preliminary injunction.

struction which will make it a rational business instrument and will effectuate what appears to have been the intention of the parties." *Borchardt v. Wilk,* 156 Wis.2d 420, 427–28, 456 N.W.2d 653, 657 (Ct.App.1990). It is doubtful that the parties meant to apply the agreement not to compete to the Sorenson Agency and not to Sorenson himself, even though Sorenson was the sole shareholder of the Sorenson Agency. Both paragraph M and common sense make this interpretation unlikely. The agreement not to compete was designed to protect against the very harm that Sorenson is inflicting upon Farmers. The contract reflects Farmers' concern that an agent could resign and convert all of his or her former policyholders to a new insurance carrier. The Court will not allow Sorenson to circumvent the explicit terms of the contract and the intent of the business agreement by using his corporate structure as a shield.

■ Even if general principles of contract construction were to require the Court to apply the covenant not to compete only to the Sorenson Agency, the Court would pierce Sorenson Agency's corporate veil and apply the covenant to Sorenson.

> The existence of the corporation as an entity apart from the natural persons comprising it will be disregarded, if corporate affairs are organized, controlled and conducted so that the corporation has no separate existence of its own and is the mere instrumentality of the shareholder and the corporate form is used to

evade an obligation, to gain an unjust advantage or to commit an injustice.

*Consumer's Co-op. of Walworth County v. Olsen,* 142 Wis.2d 465, 476, 419 N.W.2d 211, 214 (1988).[3] Sorenson had exclusive ownership and control of the Sorenson agency. He argues that the corporate structure allows him to evade obligations which would otherwise be contractually imposed through the Corporate Agreement. If necessary, the Court would disregard the corporate form and apply the covenant not to compete directly to Sorenson.

■ Sorenson also argues that his contractual duty not to compete has not yet begun or that it contains an unreasonable time restriction. The one year noncompete exclusion begins upon "payment or tender of payment" of Contract Value.[4] (Corporate Agreement ¶ I.) Farmers has offered Sorenson the first of three equal installments which will, in sum, equal Contract Value. Sorenson contends that "payment or tender of payment" of Contract Value will not occur until the final installment is offered. Alternatively, Sorenson argues that the covenant not to compete is unreasonable, in that it could last two and one-half years.[5] The Court finds Sorenson's interpretations of "payment or tender of payment" implausible.

Paragraph H specifies the installment payment procedure for Contract Value. Subparagraph b allows for a lump sum payment of Contract Value when the amount is $5,000 or less. The phrase "payment or tender of payment" therefore likely refers to the payment of the lump sum where Contract Value is $5,000 or less

**3.** *See also Capsavage v. Esser,* 224 Wis.2d 404, 410–11, 591 N.W.2d 888, 890 (Ct.App.1999) ('Piercing' is proper "where the corporation's affairs are organized, controlled and conducted so that the corporation has no separate existence of its own and is the mere instrumentality of the shareholders and the corporate form is used to evade an obligation. . . .").

**4.** "Tender" is defined as "[a]n offer of money." Black's Law Dictionary 1467 (6th ed.1990).

**5.** Although the argument is not fully developed in his brief, Sorenson argues that the phrase "for a period of one year following the date of payment or tender of payment" implies that Sorenson is excluded from soliciting Farmers' policyholders until the installments are completed, at which point the covenant not to compete begins, excluding competition for another year.

or the offer of the first installment of Contract Value where Contract Value is greater than $5,000. The one year limitation begins at "payment or tender of payment." (Corporate Agreement ¶ I.) The rationale for the one year limitation is to prevent a former Farmers agent from converting his former policyholders to a new insurance carrier. This rationale would be thwarted if the limitation on competition began when Farmers offered the final installment of Contract Value, potentially one and one-half years after an agent's termination or resignation. A one and one-half year delay would allow the agent to convert all former policyholders before the competition limitation began. This interpretation of paragraph I would lead to an irrational business contract. The Court "must adopt that construction which will result in a reasonable, fair and just contract as opposed to one that is unusual or extraordinary." *Jones*, 88 Wis.2d at 722, 277 N.W.2d at 819 (1979). In addition, "[t]he primary object in contract interpretation is to ascertain and carry out the intent of the parties." *Peace v. Northwestern Nat'l Ins. Co.*, 228 Wis.2d 106, 120, 596 N.W.2d 429, 435 (1999).[6]

Further, there is no support in the language of the contract for defendants' proposition that the limitations period begins upon payment of the first installment of Contract Value and ends one year from the payment of the last installment of Contact Value. This interpretation would result in a two and one-half year limitation period, which contradicts the express terms of the contract delineating a one year limitation on competition.[7]

 To determine whether a covenant not to compete is enforceable, the Court must consider whether it:

1) is necessary to protect Farmers' legitimate interests,

2) provides a reasonable time restriction,

3) provides a reasonable territorial restriction,

4) is harsh or oppressive to Sorenson, and

5) is contrary to public policy.

*Nalco Chemical Co. v. Hydro Technologies, Inc.*, 984 F.2d 801, 805 (7th Cir.1993) (citing *Pollack v. Calimag*, 157 Wis.2d 222, 458 N.W.2d 591 (Ct.App.1990)). Based on the foregoing, the Court is likely to find paragraph I's one year covenant not to compete reasonable. The covenant is necessary to protect Farmers' legitimate interests. Farmers utilizes a "captive" agency system, so that each agent works exclusively with Farmers and receives a territory of operation from Farmers. The agents benefit from the goodwill and name recognition that Farmers has attained in the community through its advertising, public relations and history of operation. Farmers argues that its goodwill generally translates into long-term customer relationships, so that Farmers has an expectation that its existing policyholders will remain Farmers policyholders into the future. As a "captive" agent, each Farmers agent cultivates Farmers'

---

6. As stated previously, "[s]o far as reasonably practicable, a contract should be given a construction which will make it a rational business instrument and will effectuate what appears to have been the intention of the parties." *Borchardt v. Wilk*, 156 Wis.2d 420, 427–28, 456 N.W.2d 653, 657 (Ct.App.1990). *See also Carey v. Rathman*, 55 Wis.2d 732, 737–38, 200 N.W.2d 591, 594 (1972) ("The general rule of interpretation of a contract is to determine the intent from the instrument as a whole and not necessarily from isolated or particular parts thereof.... The meaning of particular parts or words in a contract should be determined in light of and consistent with the general purpose of the agreement.... [A] construction which makes a contract reasonable, fair and just will be given over one making the contract unusual or extraordinary....") (citations omitted).

7. Furthermore, the phrase "date of" in the clause "for a period of one year following the date of payment or tender of payment" implies that tender of payment for purposes of the non-compete limitation occurs on a date, not over a time period.

goodwill on a personal level and becomes the face of Farmers insurance to the policyholders. As a result, Farmers is vulnerable to policy conversion when a Farmers agent resigns and begins selling competing insurance products.

By virtue of the confidential information entrusted to Farmers' agents and the close personal relationships these agents develop with policyholders on Farmers' behalf, if the agent immediately begins competing with Farmers, the agent will have such an unfair advantage with the policyholders that Farmers will have virtually no opportunity to recognize the expectancy of future business it would otherwise realize from its goodwill.

(Pls.' Br. is supp. of inj. at 6.)

Paragraph I's covenant imposes reasonable time and geographic limitations. Sorenson may not solicit Farmers' policyholders in his district for one year. The covenant not to compete does not preclude Sorenson from practicing his trade nor does it force Sorenson to relocate. Sorenson is free to immediately solicit non-Farmers policyholders, which he has been doing through his other agency, PIA, long before he breached the Corporate Agreement. Non–Farmers' policyholders constitute over 95% of the population in the relevant area.[8] In addition, Sorenson need only wait one year to solicit his Farmers policyholders. For these reasons, the restriction does not impose an overly harsh burden on Sorenson. Further, it is unlikely that the Court will find this restriction to be against public policy.

Defendant argues that paragraph J is an invalid covenant not to compete, and that therefore paragraphs I and J are unenforceable.[9] The defendant argues that the following clause, which the Seventh Circuit deems an unenforceable covenant not to compete, is illustrative:

[The][e]mployee shall not ... either during the term of his employment or after its termination, communicate or disclose to any person, firm, association or corporation, or use for his own account, without Nalco's consent, any information acquired by him in the course of or incident to his employment relating to or regarding the names of customers ... sales or service data ... or any other data or information concerning [Nalco's] business and activities.

*Nalco*, 984 F.2d at 803 n. 1 (7th Cir.1993) (applying Wisconsin law). However, paragraph J in the Corporate Agreement is narrower than the restrictive clause in *Nalco*. Paragraph J defines an agent's duties regarding Farmers' property during the course of the agent relationship. Paragraph J requires Sorenson to return Farmers' property upon termination of the Corporate Agreement and specifies that this property shall not be used to Farmers' detriment.[10] Unlike the *Nalco* clause, which applies "during the term of his employment or after its termination," paragraph J does not prohibit any conduct subsequent to Sorenson's termination.[11]

---

8. Farmers' market share in the relevant three county area surrounding Sorenson's Farmers agency is under 2%. Sorenson is free to solicit business from the other 98%.

9. Defendant cites *Streiff v. American Family Mutual Ins. Co.*, 118 Wis.2d 602, 611–12, 348 N.W.2d 505, 510–11 (1984) (Holding two separate clauses which constitute one indivisible covenant not compete unenforceable under Wis.Stat. § 103.465, which states that where an indivisible covenant imposes an unreasonable restraint, the covenant is illegal, void, and unenforceable even as to so much of the covenant as would be a reasonable restraint.)

10. The Court need not determine at this time whether Sorenson is required to turn over his separate set of files or the database he downloaded into General Casualty's computer system, as Sorenson is enjoined from soliciting Farmers' policyholders.

11. Paragraph J restricts the dissemination and publication of its manuals, lists and records, and states that these items "shall be returned to the COMPANIES upon termination of the AGENCY." This phrase supports the Court's interpretation that paragraph J defines the agent's duties while in the agency relationship.

Nothing in paragraph J prevents Sorenson, after his relationship with Farmers has been terminated, from recreating and utilizing a list of his former Farmers policyholders based on information he acquired while he was a Farmers agent. Paragraph J is valid and does not impact paragraph I.

For the reasons discussed above, the remaining requirements for injunctive relief are satisfied. Farmers will endure irreparable and unquantifiable harm if injunctive relief is denied. Sorenson's ability to immediately convert his Farmers policyholders would severely impact Farmers' market share in the relevant area. This loss would affect future growth and could eliminate Farmers' goodwill in the area. In contrast to Farmers' irreparable potential loss, Sorenson can continue to solicit over 95% of the population to support PIA, his independent insurance agency. Sorenson will also be free to solicit his former policyholders a year from the date Farmers offered him the first installment of Contract Value. The Court also notes that Farmers' required showing under the balance of harms test is reduced where the likelihood of success on the merits is high, as it is here. Lastly, the public's interest is furthered by enforcing the terms of the Corporate Agreement. Sorenson is currently violating his contractual agreement not to solicit his Farmers policyholders. The public benefits from the enforcement of contractual obligations.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Sorenson is enjoined from directly or indirectly soliciting, accepting, or servicing the insurance business of any Farmers policyholder of record in the agencies of district number 35. This injunction will be in effect for one year from the date that Farmers offered its first installment of Contract Value.

2. Sorenson is required to turn over his Farmers phone number and office lease.

**SO ORDERED.**